**SOCIETY OF LLOYD'S**

v.

**Alan Louis BAKER.**

Supreme Judicial Court of Maine.

Argued Dec. 7, 1995.

Decided April 9, 1996.

Barbara A. Cardone (orally), Rudman & Winchell, Bangor, for Plaintiff.

Thad B. Zmistowski (orally), Bernard J. Kubetz, Eaton, Peabody, Bradford & Veague, Bangor, for Defendant.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, DANA, and LIPEZ, JJ.

LIPEZ, Justice.

Defendant Alan Louis Baker appeals from a summary judgment entered in the Superior Court (Penobscot County, *Alexander, J.*) in favor of plaintiff Society of Lloyd's on its complaint seeking enforcement of a foreign judgment. Baker contends that the court's grant of a summary judgement was in error because the foreign court's jurisdiction over him was fraudulently induced and, therefore, the court should not have recognized the foreign court's judgment.

Alan Baker became a "Name" in the Society of Lloyd's (Lloyd's) in 1979.[1] In the latter part of 1986, after receiving assurances concerning the stability of his investments,

---

1. The Society of Lloyd's, or as it is more commonly known, Lloyd's of London, is an insurance marketplace somewhat analogous to the New York stock exchange. The Society was created by an Act of Parliament to regulate this market. The individual underwriting members, known as "Names," join together into syndicates to underwrite certain risks. There are over three hundred syndicates competing within Lloyd's for the underwriting business, each managed by an entity called a managing agent. Each managing agent is responsible for his own syndicate's wellbeing and tries to attract capital and underwriting business.

Capital comes from the Names, who are represented in their dealings with Lloyd's by member agents. To become a Name, one must apply to the Society of Lloyd's and be sponsored by an existing member. Applicants must pass a means test to determine that they possess sufficient as-

sets to satisfy claims. Those accepted as Names must obtain a letter of credit in favor of Lloyd's to serve as security. The amount of the letter of credit, as well as the Name's means, determines the premium limit for each Name. Upon becoming a Name an individual selects from a list of syndicates, with the aid of only very limited information, and decides how much to invest in each one. Names typically belong to several syndicates in order to spread their risks. The profits that Names earn are in proportion to their capital contribution and Names are responsible for their proportionate share of a syndicate's losses up to their net worth. This liability is several and not joint. *See generally,* GODFREY HODGSON, LLOYD'S OF LONDON (1984). *See also Shell v. R.W. Sturge, Ltd.,* 55 F.3d 1227, 1228–29 (6th Cir.1995); *Bonny v. Society of Lloyd's,* 3 F.3d 156, 158–59 (7th Cir.1993), *cert. denied* —— U.S. ——, 114 S.Ct. 1057, 127 L.Ed.2d 378 (1994).

Baker signed a new General Undertaking agreement with Lloyd's that reaffirmed his underwriting arrangement with Lloyd's and contained an explicit jurisdictional consent and exclusivity provision making England the exclusive forum for adjudication of any disputes between the parties. Baker read and understood this jurisdictional provision and signed the agreement. The new General Undertaking was to take effect on January 1, 1987. During this same time period, Baker also decided to increase his investment and to switch management of his investment to another member agent. By September 1989 the syndicates that Baker had invested in began to suffer repeated losses and Baker relinquished his position as a Name.

In August 1990 Lloyd's directed that Baker pay £ 32,041 pursuant to the provisions of section 10–A(2) of Lloyd's Central Fund By-law.[2] In breach of the contract, Baker refused to pay the amount specified and Lloyd's subsequently served notice on Baker of the commencement of a civil action in England's High Court of Justice, Queen's Bench Division, demanding payment of the £ 32,041. After Baker failed to appear to defend, the High Court of Justice, Queen's Bench Division, Commercial Court, entered a default judgment against Baker in the amount of £ 32,041 and £ 208 in costs.

In November 1993 Lloyd's filed a complaint in the Superior Court seeking enforcement of the English judgment. Lloyd's later moved for a summary judgment on the ground that the court should enforce the English Court's judgment. Baker opposed the summary judgment and moved to stay the proceeding and to add the affirmative defense of claim preclusion to his responsive pleadings.

The court entered a summary judgment for Lloyd's, concluding that Baker's allegations of fraud provided no basis for collaterally attacking the English judgment, and denied Baker's motions to stay the proceedings and amend his answer. We affirm the summary judgment.

*Comity*

 Although a judgment obtained in a foreign country does not conclusively establish a party's liability, the foreign court's judgment is prima facia evidence of the party's liability. *Tremblay v. Aetna Life Ins. Co.,* 97 Me. 547, 554, 55 A. 509, 512 (1903); *Rankin v. Goddard,* 54 Me. 28, 33 (1866). Thus, the question presented to the court was whether to apply the doctrine of comity to the English judgment.

> Comity is a recognition which one nation extends within its own territory to the legislative, executive, or judicial acts of another. It is not a rule of law, but one of practice, convenience and expediency. Although more than mere courtesy and accommodation, comity does not achieve the force of imperative or obligation. Rather, it is a nation's expression of understanding which demonstrates due regard both to international duty and convenience and to rights of persons protected by its own laws. Comity should be withheld only when its acceptance would be contrary or prejudicial to the interest of the nation called upon to give it effect.

*Somportex Ltd. v. Philadelphia Chewing Gum Corp.,* 453 F.2d 435, 440 (3rd Cir.1971), *cert. denied,* 405 U.S. 1017, 92 S.Ct. 1294, 31 L.Ed.2d 479 (1972) (citations omitted). The application of the doctrine of comity depends upon fixed and well understood principles. 16 AM.JUR.2D *Conflict of Laws* § 11 (1979). That application is a question of law that may be resolved by the court on a motion for a summary judgment. *See Tondreau v. Sherwin–Williams Co.,* 638 A.2d 728, 730 (Me. 1994) (court may enter summary judgment when dispute exists only as to legal conclusion to be drawn from facts); *Tisei v. Town of Ogunquit,* 491 A.2d 564, 568 (Me.1984) (summary judgment proceedings address questions of law).

 Relying on section 68 of the RE-STATEMENT (SECOND) OF JUDGMENTS, Baker contends that the default judgment rendered by the English Court against him should not have been recognized by the Superior Court

---

2. In summary, Section 10–A of Lloyd's Central Fund Bylaw states that when Lloyd's applied monies from its central fund for the benefit of a Name for such purposes as "making good" or "preventing" default the Name must pay to Lloyd's the amount specified by Lloyd's.

because the English Court's jurisdiction over him was induced by fraud. In essence, Baker argues that he continued as a "Name" in reliance on misrepresentations made by Lloyd's representatives about the nature and stability of his investment, and he was thereby fraudulently induced to sign the 1987 General Undertaking that contained the jurisdictional consent and exclusivity provision.

Baker misconstrues the scope and rationale of section 68 of the Restatement. Section 68 states in pertinent part that

> [A] judgment by default may be avoided if the judgment;
>
> (1) Resulted from the defaulting party's being induced by fraud or duress to submit to the jurisdiction of the court or to refrain from contesting the action.

RESTATEMENT (SECOND) OF JUDGMENTS § 68 (1982). Application of this section is limited to those instances when the defaulting party's "failure to appear is attributable to a fraudulent act of the party procuring the judgment. The fraud may inhere in the process of establishing jurisdiction or giving notice or in inducing the defendant not to appear after he was given notice." RESTATEMENT (SECOND) OF JUDGMENTS § 68 cmt. b (1982). As explained by one commentator, permitting a party to avoid a default judgment induced by fraud

> was one of the ameliorating doctrines developed to avoid injustice in the days when the power theory of the nature of jurisdiction held sway. When physical presence of the defendant within the territory of the forum was considered constitutionally sufficient for personal jurisdiction, plaintiffs sometimes sought to exploit that principle by luring the defendant into the territory by fraud or trickery ... To remove the incentive for such conduct on the part of plaintiffs, courts developed a doctrine of avoiding jurisdiction when personal service on the defendant was obtained by force or fraud.

ROBERT C. CASAD, JURISDICTION AND FORUM SELECTION § 7:12 (1994). Thus, courts have generally applied the principle of law reported in section 68 to those limited instances when the prevailing party's fraud was designed to and actually causes the defaulting party to suffer the default judgment. *See* James O. Pearson, Jr., Annotation, *Fraud in Obtaining or Maintaining Default Judgment as Ground for Vacating or Setting Aside in State Courts*, 78 A.L.R.3d 150, 157 (1977).

Although Baker correctly asserts that, pursuant to the Restatement, the labels of "extrinsic" or "intrinsic" fraud no longer determine which circumstances justify overcoming the conclusiveness of a judgment,[3] the Restatement also recognizes that the case law analysis justifying relief from a judgment still "roughly corresponds to the

---

**3.** Comment c to § 70 or the RESTATEMENT (SECOND) OF JUDGMENTS states in pertinent part:

> Later decisions ... attempted to draw distinctions in terms other than the positiveness with which the fraud could be shown, and these have led to much confusion.
>
> The most widely recognized distinction was between 'extrinsic' and 'intrinsic' fraud. Ir its core meaning, 'extrinsic' fraud meant fraud that induced a party to default or consent to a judgment against him. *See* § 68. 'Intrinsic' fraud meant knowing use of perjured testimony or otherwise fabricated evidence. But this distinction was obliterated by decisions in which it was reasoned that offering fabricated evidence 'prevented' the other party from contesting the proposition for which the fabricated evidence was offered as proof. Hence in many jurisdictions the distinction between 'extrinsic' and 'intrinsic' fraud was accepted nominally but not in substance. Moreover, it was never satisfactorily explained why a litigant misled into defaulting should be more fully protected

than one who suffered judgment by reason of deception committed in open court.

....

> Aside from not being very persuasive, these various distinctions are not consistently applied. Specifically, when the evidence of fraud is weak, or when it appears that the victim should have anticipated the possibility of fabrication or concealment, the decisions often invoke the proposition that relief may not be granted on the basis of 'intrinsic' fraud. It is also clear that there is discord in the underlying judicial attitudes toward relief on the basis of fraud, some courts being more responsive than others. Allowing for all these factors, if the cases are read with close attention to their facts, the critical considerations usually are whether the claim of fraud is well substantiated and not merely asserted at large and whether in the original action the victim pursued reasonable precautions against deception.

RESTATEMENT (SECOND) OF JUDGMENT § 70 cmt. c. (1982).

distinction formerly drawn between 'extrinsic' and 'intrinsic' fraud." RESTATEMENT (SECOND) OF JUDGMENTS § 68 cmt. a (1982). Thus, courts generally continue to permit relief only when the alleged fraud is of the type formerly denominated as "extrinsic" fraud, *i.e.* when the aggrieved party alleges that the prevailing party's fraudulent conduct (to use the classic term) "prevented" the defaulting party from contesting the action or having knowledge of the pending suit. *See* 47 AM.JUR.2D *Judgments* § 832 (1995) ("Courts in a number of jurisdictions provide relief from judgment on the basis that it was obtained through extrinsic fraud.").[4]

Baker does not allege that Lloyd's deceived him about the meaning or purpose of the forum selection clause, nor that it was surreptitiously added to the 1987 General Undertaking. Indeed, he admits in his affidavit that before signing the 1987 General Undertaking he "noted" the forum selection clause and signed despite its presence. Moreover, Baker concedes that the entry of a default judgment against him was not the result of any chicanery on the part of Lloyd's, but rather was the result of his decision not to defend in order to conserve his resources. Thus, Baker failed to make any showing that the English judgment was the product of fraud or deception designed to prevent him from fully litigating a suit brought pursuant to the forum selection clause, or that there was fraud in the process by which jurisdiction was established.

In contrast, Baker does allege that Lloyd's representatives fraudulently represented to him at the time of his initial investment, and prior to his decision in late 1986 to remain a Name, both the nature and the extent of the risk to which he was exposed. Baker states in his affidavit that he invested with Lloyd's because Lloyd's represented such an investment as a "stable," "conservative," "low risk," "can't miss retirement policy," and that he would not have made his initial investment or increased his investment with Lloyd's if he had known it to be otherwise. Baker's allegations of fraud relate to the business deal that he made, not to an issue of jurisdiction or the obtaining of the default judgment. The question of whether Baker may disaffirm the entire contract based on his allegations of fraud is one that he must raise and litigate in the English Court. The Superior Court properly recognized that court's judgment.

### Refusal to Stay the Proceedings

We also reject Baker's contention that the court abused its discretion when it refused to stay the proceedings in the enforcement action pending the outcome of proceedings occurring in England, the successful prosecution of which may permit Baker to avoid the English judgment as a matter of law.[5] "A stay of proceedings ... is not a matter of right but a matter of grace. The grant or denial of the stay rests in the sound discretion of the court. It will only be granted when the court is satisfied that justice will thereby be promoted." *Cutler Associates, Inc. v. Merrill Trust Co.*, 395 A.2d 453, 456 (Me.1978) (citations omitted). Baker has not yet attempted to avoid the English judgment by directly or collaterally attacking it in the English Court. He has not demonstrated how a stay would serve any purpose other

---

4. As the quotation contained in the parenthetical remark makes clear, despite the Restatement's attempt to disavow the intrinsic-extrinsic distinction as a basis for disturbing the conclusiveness of judgments, the distinction and terminology are so well-entrenched in American jurisprudence that many courts continue to discuss and rely on it. *See* James O. Pearson, Jr., Annotation, *Fraud in Obtaining or Maintaining Default Judgment as Ground for Vacating or Setting Aside in State Courts,* 78 A.L.R.3d 150, 157 (1977 & Supp.1995) (listing recent cases holding or recognizing that judgment will be vacated or set aside only on basis of extrinsic fraud). *See also* RESTATEMENT (SECOND) OF JUDGMENTS § 68 (SUPP.1994) (same).

5. Currently in the courts of England over one thousand Names are disputing their liability to pay the amounts demanded from them by Lloyd's with respect to their underwriting obligations. Among the defenses interposed by these Names is the contention that Lloyd's Central Fund Bylaw is in violation of the Treaty of Rome because the Bylaw has the effect or object of preventing, restricting, or distorting competition within the European Common Market. These Names contend that because the Central Fund Bylaw is in contravention of an international treaty to which England is a signatory, the entire Bylaw should be void for illegality.

than delay. The court did not abuse its discretion in denying his motion for a stay.

*Denial of Motion for Leave to Amend*

■ Finally, we reject Baker's contention that the court abused its discretion in denying his motion for leave to amend his answer to include the affirmative defense of nonmutual offensive collateral estoppel. A motion for leave to amend an answer is addressed to the discretion of the trial court, and "[t]o overturn a denial of leave to amend one 'must demonstrate a clear and manifest abuse of that discretion and must demonstrate granting such motion is necessary to prevent injustice.'" *Miller v. Szelenyi*, 546 A.2d 1013, 1022 (Me.1988) (quoting *Poulette v. Herbert C. Haynes, Inc.*, 347 A.2d 596, 598 (Me.1975)). Given the court's decision to recognize the English Court's judgment as a final and valid judgment, and the inapplicability of the doctrine asserted in the denied amendment,[6] there was no error in the court's denial of Baker's motion to amend.

The entry is:

Judgment affirmed.

All concurring.

---

6. Collateral estoppel applies only when the issue that the party is to be precluded from relitigating has been (1) actually litigated; (2) determined by a final and valid judgment and (3) the determination is essential to the judgment. *See Morton v. Schneider*, 612 A.2d 1285, 1286 (Me.1992) (citing *Sevigny v. Home Builders Ass'n of Maine*, 429 A.2d 197, 201–02 (Me.1981)). In support of his motion to amend his answer, Baker relied on findings contained in an interlocutory order issued by the United States District Court for the Southern District of Texas in *Leslie v. Lloyd's*, H–90–1907, 1994 WL 873350 (S.D.Tex. Nov. 7, 1994). The subject of the order was the plaintiff's motion seeking a preliminary injunction enjoining Lloyd's from presenting the plaintiff's irrevocable letter of credit for payment during the pendency of the litigation. *Id.* at 4–14. In its order denying Leslie's motion for a preliminary injunction the court found that evidence presented by Leslie indicated potentially fraudulent acts on the part of Lloyd's. *Id.* at 17. The court, however, expressly stated that its findings were made "solely in regard to the issue of Leslie's Motion for a Preliminary Injunction." *Id.* at 3. The interlocutory order of the federal district court relied on by Baker in his motion to amend his complaint is not a final judgment, and therefore cannot be successfully pleaded as collateral estoppel. *See Sevigny v. City of Biddeford*, 344 A.2d 34, 39 (Me.1975) (stating that an order granting or denying a temporary injunction is interlocutory in nature, does not involve a final determination on the merits, and, therefore, cannot be pleaded as collateral estoppel).