**Susan D. LUNDBORG, etc., Plaintiff, Appellant,**

v.

**PHOENIX LEASING, INC., et al., Defendants, Appellees.**

No. 95–2278.

United States Court of Appeals, First Circuit.

Heard March 8, 1996.

Decided Aug. 5, 1996.

Ralph A. Dyer with whom Law Offices of Ralph A. Dyer, P.A., Portland, ME, was on briefs, for appellant.

David M. Wiseblood with whom Robert B. Kaplan, Joseph N. Demko, Frandzel & Share, San Francisco, CA, Anthony Perkins and Bernstein, Shur, Sawyer & Nelson, Portland, ME, were on brief, for appellees.

Before BOUDIN, Circuit Judge, CAMPBELL, Senior Circuit Judge, and LYNCH, Circuit Judge.

BOUDIN, Circuit Judge.

In this case, the district court dismissed claims brought by Susan Lundborg against Phoenix Leasing, Inc. ("Phoenix Leasing"), on the ground that they were barred by *res judicata.* We affirm the district court's judgment of dismissal but are compelled to do so on a ground that leaves open to Lundborg the opportunity to pursue a central aspect of her claims by an independent action in Maine state court. For reasons that will become apparent, such a suit is not a promising venture.

I.

The facts of the case are complicated and its procedural history involved; we offer a condensed version here. Because the district court dismissed the claims at issue on a motion to dismiss, the underlying "facts" described below are primarily drawn from the allegations of the complaint, *Rockwell v. Cape Cod Hospital,* 26 F.3d 254, 256 (1st Cir.1994), supplemented by pleadings in related cases of which the district court took judicial notice. In fact, there are *six* other related cases.

Susan Lundborg, a resident of Florida, was the sole shareholder of Community Cable Services of Maine, Inc. ("Community Cable"), which in 1988 became a general partner in Merlin Cable Operators ("Merlin"), a Maine general partnership. Soon after its formation, Merlin secured franchises to construct and operate two cable television systems in Maine. The partnership sought to

borrow $850,000 of the estimated $1,000,000 cost of these projects.

In early 1989, Phoenix Leasing, a California corporation, agreed to loan Merlin that sum at an annual interest rate of 18 percent. The terms of the loan also required Merlin to pay Phoenix Leasing 25 percent of the value of the projects up to $150,000, plus an additional $50,000 for each year the loan was outstanding after 1990, amounting to what Lundborg claims was an effective annual interest rate in excess of 40 percent. The loan was secured by the cable systems and by Lundborg's personal guaranty, itself secured in part by a mortgage on her house in Suffolk County, New York.

In 1990, two additional cable television operators owned wholly or in part by Lundborg agreed to borrow money from Phoenix Leasing. The loans to Cable One CATV ("Cable One"), a New Hampshire limited partnership, and Sure Broadcasting, Inc. ("Sure"), a Delaware corporation, also imposed high rates of interest and demanding terms. Lundborg personally guaranteed the loans to Cable One and Sure, again giving Phoenix Leasing a mortgage on her Suffolk County house. The total of the three loans exceeded $4 million.

By December 1990, all three borrowers had stopped making payments to Phoenix Leasing and in April 1991, Phoenix Leasing began court actions to recover upon the loan agreements and to foreclose on the various properties securing the loans and Lundborg's personal guaranty. These included state court actions in Maine (against Merlin, Community Cable, and others) and New York (against Lundborg), and federal suits in New Hampshire (against Cable One and others) and Nevada (against Sure).[1] Phoenix Leasing later filed claims in Merlin's federal bankruptcy proceeding in Maine and in Cable One's similar proceeding in New Hampshire.[2]

Phoenix Leasing has prevailed in every case that has reached decision. In May 1991, Phoenix Leasing began a Maine state court action to recover on the original $850,000 loan. Merlin raised several affirmative defenses, including the defense of usury, and brought several compulsory counterclaims, see Me.R.Civ.P. 13(a), including claims for fraud, breach of duty of good faith, negligence, and abuse of process. The usury defense was cast in general terms and the fraud claims related to alleged actions of Phoenix Leasing quite different than the fraud charges that are now advanced.

Phoenix Leasing's Maine state court suit against Merlin was dismissed after Merlin filed for bankruptcy in August 1991. In September 1992, the Maine state court entered a default judgment against Community Cable on Phoenix Leasing's claims and Community Cable's counterclaims. In early 1994, the federal bankruptcy court in Maine awarded Phoenix Leasing cash and a promissory note on account of its claim against Merlin.

Phoenix Leasing also prevailed in February 1992 in its suit in New York state court against Lundborg to foreclose on her mortgage. In New Hampshire, Cable One declared bankruptcy after Phoenix Leasing brought suit in district court; but in the ensuing bankruptcy proceeding in New Hampshire, the court in December 1992 approved a settlement in favor of Phoenix Leasing and in July 1993 confirmed the plan of liquidation. In March 1995, Phoenix Leasing won its suit in the federal district court in Nevada to recover on the loan to Sure.

In February 1994, Lundborg learned that the loans to Merlin, Cable One, and Sure were not funded by Phoenix Leasing, but rather by two limited partnerships, in each of which Phoenix Leasing was general partner. This fact emerged during the deposition of

---

1. *Phoenix Leasing Inc. v. Merlin Cable Partners,* No. CV–91–343 (Me.Sup.Ct. York Cty.); *Phoenix Leasing Inc. v. Susan Lundborg,* No. 91–08094 (N.Y.Sup.Ct. Suffolk Cty.); *Phoenix Leasing, Inc. v. Cable One CATV Limited Partnership,* Civ. No. 91–164–D (D.N.H.); *Phoenix Leasing Inc. v. Sure Broadcasting, Inc.,* No. CV–N–91–185–ECR (D.Nev.).

2. *In re Merlin Cable Partners,* BK No. 93–10067 (Bankr.D.Me.); *In re Cable One CATV Limited Partnership,* BK No. 91–12387–JEY (Bankr. D.N.H.).

Gary Martinez, Phoenix Leasing's executive vice president, in the *Sure* litigation in district court in Nevada. Lundborg alleges that these limited partnerships, and not Phoenix Leasing, were the "actual lenders" in the loan transactions.

This is said to matter because Phoenix Leasing, as a licensed personal property broker, was admittedly exempt from California's usury laws which cap the interest rate that an unlicensed lender may charge. The limited partnerships, Lundborg claims, were not exempt and the loans were therefore usurious and fraudulent. Moreover, Lundborg asserts that by suing in its own name, Phoenix Leasing misrepresented its standing to recover upon the loans in the various court actions, and Lundborg says this amounted to additional fraud.

Based on the Martinez deposition, Lundborg in June 1994 moved in the New York state suit to set aside the judgment on the ground that Phoenix Leasing lacked standing to foreclose on the mortgage because it was not the true lender; the New York court denied this motion and Lundborg did not appeal. In the then pending Nevada federal action, Sure moved for summary judgment on similar grounds; in December 1994, the district court rejected this argument and in March 1995 entered judgment for Phoenix Leasing, a ruling later upheld by the Ninth Circuit in an unpublished opinion.

In the bankruptcy courts in Maine and New Hampshire, Lundborg made somewhat broader efforts to reopen the judgments but with the same result. In January 1995, the Maine bankruptcy court (in circumstances more fully described hereafter) rejected Lundborg's motion for relief from judgment on account of fraud and based upon the Martinez deposition. In November 1995, the New Hampshire bankruptcy court rejected Cable One's effort to set aside the earlier settlement of the case, ruling that the limited partnerships involved in the Cable One loan in fact had licenses permitting them to exceed the usual usury limit under California law. At least one of the limited partnerships in the Merlin transaction was evidently not involved with the Cable One loan.

No comparable effort was made by Lundborg to reopen the earlier Maine state court default judgment entered against Community Cable in September 1992. Instead, in December 1994, Lundborg filed the present action against Phoenix Leasing and others in the federal district court in Maine, both on her own behalf and as successor in interest to Merlin and Community Cable. The gravamen was the same set of fraud allegations stemming from the Martinez deposition but the complaint set forth a welter of claims.

Lundborg's complaint included nine counts: a statutory claim for perjury arising under Maine law (count I); abuse of process in connection with the litigation in New York (count II); common law conversion, fraud, breach of duty of good faith, and interference with economic opportunity (counts III–VI); violation of California's usury statute (count VII); unjust enrichment (count VIII); and violation of the federal civil RICO statute (count IX). Additional defendants were the limited partnerships that allegedly funded the Merlin loan, Gus Constantin (the chairman of Phoenix Leasing) and Martinez.

All defendants in the Maine district court moved to dismiss. Adopting the able recommended decision of the magistrate judge, the district court granted this motion on September 6, 1995, without a separate opinion. The district court found that Lundborg had failed to articulate a RICO claim; in the absence of that claim the court held that it had no personal jurisdiction over the individual defendants as to any of the counts. Lundborg does not appeal these rulings.

The district court further held that the September 1992 judgment in Maine state court barred all of Lundborg's claims on *res judicata* grounds and, further, that Lundborg was estopped by judgments in New York and in the Maine bankruptcy court from relitigating the issue of Phoenix Leasing's fraud. Lundborg appeals this ruling as to counts I, III, IV, V, VII and VIII with respect to Phoenix Leasing and the limited partnerships.

## II.

As an initial matter, Lundborg argues as a matter of law that her count I claim for

perjury, pursuant to 14 Me.R.S.A. § 870, cannot be precluded by the earlier judgment in Maine state court. Section 870 creates a cause of action "[w]hen a judgment has been obtained against a party by the perjury of a witness introduced at trial by the adverse party," and provides that "the judgment in the former action is no bar" to such a suit. Phoenix Leasing insists that Lundborg waived this argument by failing to articulate it in the district court.

■ We affirm the dismissal of the perjury count because Lundborg has not stated a claim under the statute. Lundborg alleges that pleadings and affidavits submitted in the Maine state court action were perjurious. But section 870 applies only to testimony "introduced at trial by the adverse party," and the Maine action was decided prior to trial. The Maine Supreme Judicial Court has made clear that section 870 is to be construed strictly, *Spickler v. Greenberg,* 644 A.2d 469, 472 (Me.1994); and we have no qualm in holding Lundborg to "the terms of the statute." *Id.* (quoting *Milner v. Hare,* 126 Me. 14, 135 A. 522 (1926)).

This brings us to the heart of Lundborg's remaining claims. California law, which governed the Merlin loan, limits the amount of interest that can be charged on any loan; the law exempts certain classes of loans and lenders from its provisions. Cal. Const. Art. 15, § 1. Phoenix Leasing was a "personal property broker" and therefore exempt from the usury statute. Former Cal.Fin.Code § 22009. (The current version of the statute refers to lenders like Phoenix Leasing as "finance lenders" but the change appears to be one of name only.)

Lundborg alleges that the Merlin loan was funded by two limited partnerships, Phoenix Leasing Cash Distribution Fund III and Phoenix Leasing Income Fund 1975 ALP, and that these partnerships were not then licensed as personal property brokers. Lundborg insists that the partnerships were the actual lenders in the Merlin transaction, that Phoenix either assigned the loan to the partnerships or held it as their agent and that the loan was therefore usurious. The complaint seeks actual damages of over $6 million.

This set of allegations and arguments gives rise to Lundborg's remaining claims. Counts III, IV, V, and VIII, while variously styled, all charge that Phoenix Leasing defrauded Merlin and Lundborg by failing to disclose the identity of the "actual lenders" at the time the loan was negotiated and thereafter, particularly when Phoenix Leasing pursued legal claims against Merlin and Lundborg in its own name. Count VII is a claim for treble damages under the civil remedy provision of California's usury law. Cal.Civ.Code § 1916–3.

It is far from clear that the funding arrangement alleged by Lundborg was illegal under California law. *See, e.g., Strike v. Trans–West Discount Corp.,* 92 Cal.App.3d 735, 155 Cal.Rptr. 132, 139, *appeal dismissed,* 444 U.S. 948, 100 S.Ct. 417, 62 L.Ed.2d 317 (1979). Phoenix Leasing points out that a licensed lender may assign a high-interest loan to an unlicensed third party; elsewhere Phoenix Leasing has argued that despite the internal accounting arrangements that it made, it remained the holder of the Merlin note under California law. An argument by Sure that challenged the funding arrangement of its own loan was rejected by the Nevada district court in *Phoenix Leasing Inc. v. Sure Broadcasting, Inc.,* CV–N–91–185–ECR, slip op. at 8–9 (D.Nev. Dec. 18, 1994):

Phoenix's continued possession of the promissory note appears to preclude any negotiation of the promissory note. Cal. Comm. § 3201. Regardless of whether Phoenix transferred ownership or the right to receive monies under the note, Phoenix may remain the holder of the note. Cal. Comm. §§ 3201 & 3203. Phoenix may also enforce the note even if it is not the owner of the note. Cal.Comm. § 3301.

But it is not certain that the facts surrounding the Sure loan are identical to those respecting the earlier loan to Merlin and the facts concerning the Merlin loan were not developed in the district court. Indeed, in briefing this case Phoenix Leasing has devoted relatively little attention to California law, understandably relying primarily on the *res judicata* rationale of the district court.

Thus, the question for us is whether the district court's rationale can be sustained, a matter we review *de novo*. *Apparel Art Internat'l, Inc. v. Amertex Enterprises Ltd.*, 48 F.3d 576, 582 (1st Cir.1995).

■ Were it not for Lundborg's allegations of fraud, the application of *res judicata* doctrine to bar this present action would be straightforward. Under Maine law, which governs the preclusive effect of the Maine state court judgment, *e.g., Diversified Foods, Inc. v. First Nat'l Bank of Boston*, 985 F.2d 27, 30 (1st Cir.), *cert. denied*, 509 U.S. 907, 113 S.Ct. 3001, 125 L.Ed.2d 694 (1993), a valid prior judgment in an action between the same parties or their privies bars relitigation with respect to the same claims of "all issues that were tried, or may have been tried" in the prior action. *Currier v. Cyr*, 570 A.2d 1205, 1208 (Me.1990).

■ Functionally, this familiar doctrine—known in the past as the merger and bar branch of *res judicata* and now as claim preclusion—prevents a plaintiff or counterclaimant from splitting its related claims among several suits. *Apparel Art*, 48 F.3d at 583. Such a policy responds to the parties' interest in repose and the courts' desire to avoid needless litigation. Maine follows the modern rule and defines the claims that must be brought in one action by use of a transactional test, so that

> a subsequent suit that arises out of the same aggregate of operative facts shall be barred even though the second suit relies upon a legal theory not advanced in the first case, seeks different relief than that sought in the first case, and involves evidence different from the evidence relevant to the first case.

*Currier*, 570 A.2d at 1208; *see Beegan v. Schmidt*, 451 A.2d 642, 645 (Me.1982) (citing *Restatement (Second), Judgments* § 24 (1982)).

Lundborg's claims at issue here all arise out of the alleged wrongdoing of Phoenix Leasing and the limited partnerships in connection with the making and enforcement of the Merlin loan. But Merlin and Community Cable previously brought claims against Phoenix Leasing arising out of that same

loan as *counterclaims* in the Maine state court action. Although Merlin was dismissed from the action when it filed for bankruptcy, a default judgment was entered against Community Cable in that action, and a default judgment has the same claim-preclusive effect as a judgment on the merits. *Irving Pulp & Paper Ltd. v. Kelly*, 654 A.2d 416, 418 (Me.1995).

■ Lundborg asserts in conclusory fashion that the default judgment was never made final but offers no argument in support of this claim, nor do we detect any basis for it. Nor can Lundborg seriously deny that she and Merlin are in privity with Community Cable, which was wholly owned by Lundborg and was a general partner of Merlin. *Restatement, supra*, §§ 59(3), 60(2). Under the circumstances, Lundborg's present claims arise out of the same transaction as the counterclaims in the earlier action and are barred by *res judicata*, absent some exception to the general rule.

### III.

Thus far our view is the same as that of the district court. Where we part company—with some reluctance for the issue is very close—concerns a possible escape hatch from *res judicata* invoked by Lundborg in this case. It is Lundborg's position that the 1992 default judgment against Community Cable in the Maine state court cannot be considered a *valid* judgment for purposes of *res judicata* because it was tainted by an aspect of the same fraud that is the basis of Lundborg's present claims, namely, the alleged fraud in the litigation to enforce the original loan to Merlin. Otherwise, claim preclusion applies to underlying fraud charges no less than to other tort theories.

This contention takes us to a body of doctrine that has few peers in the common law as a source of confusion for lawyers and judges alike, namely, the rules that govern independent actions that collaterally attack a prior judgment. Partly, the problem is one of confusing terminology, *see Restatement, supra*, ch. 5 intro. note, and, in addition, the law in this area is neither uniform nor stable. But so far as the law permits collateral at-

tacks, the rules are effectively a set of exceptions to claim preclusion.

In the past some courts have been unwilling to treat *all* litigation fraud as an exception to *res judicata;* it has sometimes been said that only special categories of fraud, such as bribery of a judge, would permit a collateral attack. *See Restatement, supra,* §§ 68 cmt. a, 70 cmt. c. The modern approach has been to lower the substantive bar to collateral attack while insisting on severe conditions to the assertion of such a claim, due diligence in the discovery of the fraud in the original action and clear and convincing evidence of fraud in the collateral one. *Id.* § 70 cmt. d; *cf. Spickler v. Greenberg,* 644 A.2d 469, 471 (Me.1994).

In considering Lundborg's claim to a fraud exception, our concern is with Maine law because a federal district court in Maine has been asked to permit a collateral attack on a Maine state court judgment. 7 Moore, *Federal Practice,* § 60.37[3], at 60–395 (2d ed. 1995). Maine law, in accord with the *Restatement,* no longer rigidly adheres to the traditional labels of extrinsic and intrinsic fraud in determining which circumstances justify overturning a prior judgment. *Society of Lloyd's v. Baker,* 673 A.2d 1336, 1339 (Me.1996). We read *Kradoska v. Kipp,* 397 A.2d 562, 568–69 (Me.1979), to suggest that Maine is more interested in whether the fraud claim was known or should have been known at the time of the earlier action. *See* 11 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure,* § 2868, at 400–01 (2d ed. 1995).

In the present case, the district court assumed, as we do, that fraud in the course of the earlier Maine state court litigation might give rise to an exception to claim preclusion. But it held that the issue *whether* fraud had occurred had itself been resolved on the merits, adversely to Lundborg, in the New York state court and the Maine bankruptcy court. As already noted, after the Martinez deposition, Lundborg sought in 1994 to reopen the judgments in both of those courts based on some of the same assertions that are the bases for Lundborg's affirmative claims in the district court.

The district court's ruling that the fraud issue had earlier been resolved rested upon the other branch of *res judicata* known as collateral estoppel or issue preclusion. This doctrine bars the relitigation between the same parties of any issue of fact or law that was actually litigated between them, was determined and was necessary to a final, valid judgment in a prior case. *Restatement, supra,* § 27; *Spickler v. York,* 505 A.2d 87, 88 (Me.1986). Unlike claim preclusion, this doctrine requires an actual determination of the issue.

We do not share the district court's view that the decision of the New York state court that Phoenix Leasing had standing to enforce Lundborg's loan guaranties precludes Lundborg's claims here. As far as we can tell from the papers submitted to us, Lundborg did not raise her usury claims and the related fraud claims in seeking to reopen the New York action; and a holding that Phoenix Leasing had standing to enforce the loan is not necessarily inconsistent with the possibility that the loans' terms were originally made by the partnerships and were usurious under California law, and that Phoenix Leasing concealed this information from the Lundborg entities in prior litigation.

The Maine bankruptcy decision is a closer call. Merlin filed for bankruptcy in August 1991; a plan of reorganization was confirmed in May 1994, awarding Phoenix Leasing $900,000. In November 1994, Lundborg filed a motion under Fed.R.Civ.P. Rule 60(b) for relief from the judgment based on the February 1994 deposition, arguing that the deposition testimony revealed that the Merlin loan was fraudulent, usurious, and not enforceable by Phoenix Leasing. Lundborg's Rule 60(b) motion thus raised the same factual and legal arguments that she asserts in this case.

Phoenix Leasing opposed the motion on two grounds: first, that the motion was untimely under the one-year limitation on Rule 60(b) motions grounded in fraud; and second, that on the merits the loan was not fraudulent or usurious and could be collected by Phoenix Leasing. In denying Lundborg's Rule 60(b) motion, the bankruptcy court found tersely that Lundborg had stated "no

basis" for granting the motion. The result is that we cannot tell whether the bankruptcy court rested on lack of timeliness or on the merits in denying the motion to reopen.

Thus Phoenix Leasing cannot carry its burden, as the party claiming the benefit of issue preclusion, to show that the fraud issue was actually decided in the prior case by the Maine bankruptcy court. *See Dowling v. United States*, 493 U.S. 342, 350, 110 S.Ct. 668, 673, 107 L.Ed.2d 708 (1990). Lundborg may therefore be free under Maine law to press her collateral attack on the earlier Maine state judgment, assuming that she can prove her charge of fraud in the prior proceeding and meet the other requirements for such an attack. At least, this possibility is not foreclosed by issue preclusion.

## IV.

To say that the claims may survive a *res judicata* defense is not to say that the district court was wrong in dismissing the case. In order to reach the merits on the counts in question (*e.g.*, fraud, conversion), Lundborg must first succeed in her collateral attack on the Maine state court judgment. Although in form she does not ask for a declaration or injunction, in substance this is a collateral attack because the relief sought would undo the Maine judgment and because *res judicata* bars the claims unless the Maine judgment is held to be vitiated by fraud. *See Griffith v. Bank of New York*, 147 F.2d 899, 901 (2d Cir.1945).

But "[t]he principle" is that, where possible in collateral attacks, "relief should ordinarily be sought in the court that rendered the judgment" being thus challenged. *Restatement, supra*, § 79, cmt. b; *see also id.* § 79 cmt. d. This preference is not merely a matter of comity but also reflects practical considerations: here, the Maine state court has the advantage over all other courts, both in deciding whether fraud occurred in its own prior proceedings and in determining wheth-

er Lundborg adequately pursued discovery efforts in that case.

■ Maine's own Rule 60, like the federal rule, recognizes that an independent collateral attack based on litigation fraud may be brought even after the one-year period for a motion to reopen has passed. Me.R.Civ.P. 60(b); *Lewien v. Cohen*, 432 A.2d 800 (Me. 1981). Quite apart from administrative reasons for this distinction between reopening and collateral attack, the conditions on relief are more severe when it is made by independent action. *Restatement, supra*, § 78 cmt. c. The Maine state courts are thus an available forum.

The Supreme Court has warned that federal courts are not lightly to relinquish jurisdiction, and that even a difficult issue of state law or parallel pending state litigation is not automatically a warrant to abstain. *See* Wright, *Federal Courts* § 52 (5th ed.1994)(collecting the pertinent cases). Yet the Court has said that its own abstention decisions are not "rigid pigeonholes," *Pennzoil v. Texaco, Inc.*, 481 U.S. 1, 11 n. 9, 107 S.Ct. 1519, 1526 n. 9, 95 L.Ed.2d 1 (1987), but reflect a skein of considerations that vary with the facts of each case. *See Moses H. Cone Hospital v. Mercury Construc. Corp.*, 460 U.S. 1, 19–26, 103 S.Ct. 927, 938–42, 74 L.Ed.2d 765 (1983). And no Supreme Court decision deals directly with a case such as ours involving a collateral attack under state law upon a prior state court judgment.[3]

■ Here, we think that in the peculiar circumstances of this case, abstention is appropriate. There is a complete assurance that relief, if available at all, is fully available in the Maine state court; indeed, Maine's own law controls on this issue. Conversely, and of great importance, there is no direct federal interest nor any issue of federal law presented either by the collateral attack or by the underlying claims in the complaint. *Compare Cone*, 460 U.S at 23, 26, 103 S.Ct. at 941, 942 (noting the pertinence of an available state remedy (or lack thereof) and of

---

3. Similarly, federal appellate decisions in this area are sparse and the few cases we have found are divided. *Compare Lapin v. Shulton, Inc.*, 333 F.2d 169 (9th Cir.), *cert. denied*, 379 U.S. 904, 85 S.Ct. 193, 13 L.Ed.2d 177 (1964), and *Carr v.* *District of Columbia*, 543 F.2d 917, 927 (D.C.Cir. 1976), *with Locklin v. Switzer Bros., Inc.*, 335 F.2d 331, 334–35 (7th Cir.1964), and *Wohl v. Keene*, 476 F.2d 171 (4th Cir.1973).

federal issues) *with Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 819, 96 S.Ct. 1236, 1247, 47 L.Ed.2d 483 (1976) (emphasizing the existence of a state remedy).

Further, this suit is effectively an attempt to undo a preexisting, final judgment of a state court based upon matters pertaining solely to the conduct of prior litigation in that court. While there is no flat bar to conducting this autopsy in a federal court, the considerations of "comity and orderly administration of justice" that point toward the rendering court as the preferable forum, *Lapin,* 333 F.2d at 172, may have special weight where the latter is a state court. *Cf. Younger v. Harris,* 401 U.S. 37, 43–45, 91 S.Ct. 746, 750–51, 27 L.Ed.2d 669 (1971); 28 U.S.C. § 2283 (ordinarily barring federal courts from enjoining state proceedings).

In addition, the Maine state court is obviously the forum that can most readily determine whether *in fact* fraud occurred in its own prior proceedings and whether diligent discovery by the plaintiff in those proceedings would have uncovered in a more timely fashion the information now claimed to be vital. This appraisal is likely to be informed not only by the records possessed by the Maine state court but also by that court's superior knowledge of how its proceedings are customarily conducted and what discovery is available.

Finally, in deciding to defer to the Maine state courts, it is significant, *see Quackenbush v. Allstate Ins. Co.,* — U.S. —, ——–——, 116 S.Ct. 1712, 1721–22, 135 L.Ed.2d 1 (1996), that the implicit threshold relief required to entertain Lundborg's claims—the collateral attack on the Maine judgment—is itself an equitable remedy within the sound discretion of the court. Despite some limited common law antecedents, equity has been the main source of collateral relief from judgments, and the independent action is treated as equitable in character. Wright, Miller & Kane, *supra,* § 2868, at 396 (citing cases); *see, e.g., Lewien v. Cohen,* 432 A.2d at 805.

This appraisal leads us to affirm the dismissal of count I on the merits but to affirm the dismissal of counts III, IV, V, VII and VIII on a ground different than that adopted by the district court and with different consequences. In principle, Lundborg may pursue these counts by filing suit in Maine state court and by persuading the state court that a collateral attack on the 1992 Maine state court judgment should be allowed.

## V.

It may be of help to the parties, and to any Maine state court that may grapple with this matter, to explain our concerns about Lundborg's collateral attack. Our problem is not with Lundborg's attempt to avoid on technical grounds the loan obligations that she or her companies took on in a commercial venture. Technical defenses are sometimes narrowly read, but Lundborg is as free to argue for them as she would be to invoke a statute of limitations to avoid an otherwise just debt.

Rather, our concern is primarily with the timing of this defense. It is uncertain whether the news that the partnerships were involved came as a complete surprise to Lundborg in 1994. *Cf. In re Cable One CATV Limited Partnership,* BK No. 91–12387–JEY, slip op. at 6 (Bankr.D.N.H., Nov. 29, 1995) ("[I]t is difficult to find any misrepresentation since the principal [Lundborg] had the checks involved and was on notice as to who was advancing the monies."). But assuming surprise, it is doubtful whether Lundborg can be excused for not discovering this possible defense in the course of lawsuits brought in 1992.

This is not a case of forged documents or bribery of jurors or other kinds of litigation fraud uniquely hard to imagine or uncover. Phoenix Leasing was licensed to exceed the usury restriction and it is a fair guess that, if the Merlin loan ran afoul of the restriction because of the limited partnerships, which is far from clear, it was due to routine planning decisions made for tax or similar reasons. Lundborg knew full well of the usury laws—a boilerplate defense bearing this label was actually asserted—and she was free in the Maine state court action to explore the underpinnings of the loan.

It is possible, but we think unlikely, that a potential usury claim based on the role of the

274

limited partnerships was so substantial but at the same time so thoroughly concealed that it would have escaped even a diligent effort at discovery. Under the *Restatement,* the failure to exercise due diligence to unearth such a claim in the earlier case would itself bar a later collateral attack. *Restatement, supra,* § 70 cmt. d. In sum, even assuming that there was a usury defense, we are very doubtful that the possible usury defense was diligently pursued or that fraud can be said to infect the Maine state judgment.

Our substantial doubts are not a legal defense against a new state court action. But given the sanctions available for unfounded lawsuits, Lundborg ought to give careful consideration to her own position—and to her succession of seven straight litigation defeats in related cases—before she embarks upon an eighth lawsuit bearing a strong family resemblance. "The law abhors fraud and perjury. It also abhors interminable litigation." *Cole v. Chellis,* 122 Me. 262, 119 A. 623, 624 (1923).

*Affirmed.*