USCA1 Opinion

 

 United States Court of Appeals For the First Circuit ____________________ No. 96-1800 KEYSTONE SHIPPING COMPANY, Plaintiff - Appellant, v. NEW ENGLAND POWER COMPANY, Defendant - Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. George A. O'Toole, Jr., U.S. District Judge] ___________________ ____________________ Before Cyr, Circuit Judge, _____________ Campbell, Senior Circuit Judge, ____________________ and Stahl, Circuit Judge. _____________ ____________________ Joseph D. Steinfield with whom Joshua A. Davis, C. Dylan Sanders, ____________________ _______________ ________________ and Hill & Barlow were on brief for appellant. _____________ Stanley McDermott, III, with whom James D. Kleiner, Piper & ______________________ ________________ _______ Marbury L.L.P., and John F. Sherman, III, were on brief for appellee. ______________ ____________________ ____________________ March 20, 1997 ____________________ STAHL, Circuit Judge. This case involving an STAHL, Circuit Judge. _____________ underlying dispute over who is to pay for some $14 million in repairs to a coal cargo ship requires us to resolve one question: whether claims asserted by defendant-appellee New England Power Company ("NEP") against plaintiff-appellant Keystone Shipping Co. ("Keystone") are arbitrable. We reach two conclusions pointing to the same result. First, because the issue has already been litigated by the parties in Massachusetts state court, it is precluded from relitigation under the doctrine of issue preclusion. Second, even if the issue were not precluded, we find that Keystone and NEP have a legally-enforceable agreement to arbitrate disputes like the one here. We thus affirm. Background and Prior Proceedings Background and Prior Proceedings ________________________________ In order to resolve this appeal we must consider a long series of agreements and disputes between Keystone and NEP concerning the S.S. Energy Independence, now named the S.S. Energy Enterprise ("the Vessel"). The Vessel was constructed in the early 1980s by the New England Collier Company ("NECCO"), an unincorporated joint venture between Keystone and an NEP affiliate, New England Energy Incorporated ("NEEI"). NEP, in turn, chartered the Vessel from NECCO to deliver coal to its electric power plants. The joint venture agreement and the NEP time charter both contained arbitration provisions. -2- 2 The relationship was not an entirely happy one and a dispute between the parties followed. In 1987, Keystone commenced arbitration against NEEI under the joint venture agreement, while NEP commenced arbitration against NECCO under the time charter. In a previous appeal to this Court, we held that the two arbitrations were amenable to consolidation by federal court order. See New England Energy ___ __________________ Inc. v. Keystone Shipping Co., 855 F.2d 1, 8 (1st Cir. 1988), ____ _____________________ cert. denied, 489 U.S. 1077 (1989). _____ ______ Before the arbitration was concluded, the parties settled their differences through a settlement agreement signed by Keystone, NEP, and NEEI in October 1989 ("the 1989 settlement agreement"). Under the agreement's terms, ownership of the Vessel was to pass from NECCO to Keystone or a Keystone nominee. The parties further agreed that the Vessel's new owner would time charter the Vessel to NEP on "terms and conditions agreed to by Keystone and NEP." They annexed a draft of the proposed new time charter ("the draft charter") to the settlement agreement. Like the then- operative NEP time charter, the draft charter contained a sweeping arbitration provision. In particular, Section 41 of the draft charter provided that "[a]ny and all differences and disputes of whatsoever nature arising out of this Charter which cannot be resolved by the parties shall be put to -3- 3 arbitration in the City of Boston . . . before a board of three persons." Keystone nominated Intercoastal Bulk Carriers, Inc. ("IBC") to be the Vessel's new owner.1 In accordance with the settlement agreement, NECCO sold the Vessel to IBC and IBC, in turn, chartered the Vessel to NEP through a time charter agreement executed by IBC and NEP on December 27, 1989 ("the 1989 time charter"). The executed time charter was substantially similar to the October draft charter, but not exactly identical. The arbitration provisions in the two documents, however, were alike in all respects. That same day, December 27, Keystone and IBC entered into a management agreement which provided that Keystone would continue to manage the Vessel. The executed 1989 time charter gave NEP the option to purchase the Vessel and terminate the charter with six months' prior, written notice. In 1994, NEP decided to exercise its option, resell the Vessel to International Shipholding Corp. ("ISC"), and then recharter the Vessel from ISC. On October 27, 1994, NEP and ISC signed a Memorandum of Agreement to this effect. Several days later, on November 1, 1994, NEP notified Keystone and IBC that it was exercising its six-month purchase option and would buy the Vessel on May  ____________________ 1. Like Keystone itself, IBC is a wholly-owned subsidiary of Chas. P. Kurz & Co. ("Kurz"). -4- 4 1, 1995. NEP concurrently demanded arbitration of its right to do this, because Keystone had previously communicated that it would contest NEP's right to exercise the purchase option. Keystone alleged that in the negotiations that produced the 1989 settlement agreement NEP had represented that it would not exercise the time charter's purchase option. NEP's exercise of the option, Keystone suggested, indicated that NEP had made misrepresentations at the time of the settlement negotiations and had violated Mass. Gen. Laws ch. 93A. A three-member arbitration panel was convened to hear the parties' dispute. On March 15, 1995, the arbitration panel decided four threshold issues concerning NEP's service of the purchase notice and demand for arbitration in favor of NEP. IBC responded by filing an action in federal district court under 9 U.S.C. 10 to vacate the arbitrators' ruling, but the court dismissed the complaint as premature. See ___ Intercoastal Bulk Carriers, Inc. v. New England Power Co., _________________________________ ______________________ No. 95-10880 RW2, (D. Mass. May 18, 1995). Thereafter, Keystone and IBC resumed arbitration of the dispute. On May 17, 1995, Keystone and IBC announced that they were withdrawing the challenge to NEP's right to exercise the purchase option from arbitration, leaving to the panel the issue of whether NEP's actions had violated Mass. Gen. Laws ch. 93A. -5- 5 That same day, May 17, Keystone sued NEP in Massachusetts state court, claiming that NEP had made misrepresentations during the negotiations over the 1989 settlement agreement. NEP moved to dismiss Keystone's claims on the ground that they were governed by the arbitration provision of the 1989 time charter. Keystone responded that its claims against NEP did not arise under the 1989 time charter signed by NEP and IBC, but instead arose out of the 1989 settlement agreement, which did not have an arbitration provision. The state court agreed with NEP and dismissed Keystone's complaint. The state court concluded that the settlement agreement's provisions meant that Keystone was bound by the 1989 time charter's arbitration clause, notwithstanding the fact that Keystone had not signed the charter, which had been executed by its nominee, IBC, and NEP. See Keystone Shipping Co. v. New England Power Co., No. ___ _____________________ _____________________ 95-1141-B (Mass. Superior Court, Essex County, August 17, 1995). The dispute thus returned to the original arbitration panel, which, on August 21, 1995, concluded that NEP had the right to exercise the purchase option in the 1989 time charter. The arbitrators ordered IBC to sell the Vessel to NEP. Two days later, IBC filed an action in federal district court seeking to vacate the arbitrators' latest rulings. See Intercoastal Bulk Carriers, Inc. v. New England ___ _________________________________ ___________ -6- 6 Power Co., C.A. No. 95-11881-GAO. Shortly thereafter, on __________ September 5, 1995, Keystone filed a notice of appeal from the state court's decision to dismiss its state cause of action against NEP. This was the state of legal affairs between the parties when, on September 20, 1995, IBC and NEP entered into a new settlement agreement ("the 1995 settlement agreement"). Under the new settlement agreement, IBC agreed to transfer the Vessel in accordance with NEP's wishes to ISC's nominee, Enterprise Ship Co. ("Enterprise"). The parties expressly acknowledged that the arbitration clause found in the 1989 time charter would govern the new settlement agreement. The settlement agreement also provided for the mutual release of claims by Keystone and IBC in favor of NEP and vice versa. There was one exception to this general release. Exhibit B of the agreement expressly provided that NEP did not release Keystone and IBC from "claims, if any, by reason of the Vessel not being in class at the Closing based upon a survey . . . when the Vessel is drydocked immediately after the Closing." On September 28, 1995, the Vessel's new owner, Enterprise, took title and sent the Vessel to a shipyard for the agreed-upon inspection. The survey that followed revealed corrosion damage to the Vessel's bulkheads and cargo holds exceeding the tolerances established by the American -7- 7 Bureau of Shipping, thereby making the Vessel unseaworthy. The ship inspectors refused to allow the Vessel to sail until the needed repairs were completed. NEP alleges that the bulk of the corrosion damage was a direct result of Keystone's failure to maintain the Vessel. The total cost to bring the Vessel to standard is claimed to be approximately $14 million dollars. NEP argues that Keystone and IBC are responsible for much of that amount under the terms of the 1989 time charter. On December 20, 1995, NEP notified the arbitration panel that it desired to arbitrate its claims for the Vessel's repair costs against Keystone and IBC. Keystone denied that it was required to arbitrate NEP's claims, and on February 27, 1996 filed suit in federal district court seeking a stay of arbitration pursuant to Mass. Gen. Laws ch. 251, 2(b). NEP cross-moved under the Federal Arbitration Act, 9 U.S.C. 4, to compel arbitration. On May 24, 1996, the district court granted NEP's motion to compel, concluding that the arbitrability of NEP's claims against Keystone was an issue that had been previously decided in Massachusetts state court, and, in any event, was the result compelled by the merits. This appeal ensued. Standard of Review Standard of Review __________________ We review de novo the district court's application __ ____ of the doctrine of issue preclusion because "[t]he applicability vel non of preclusion principles is a question ___ ___ -8- 8 of law." Monarch Life Ins. Co. v. Ropes & Gray, 65 F.3d 973, ______________________ ____________ 978 (1st Cir. 1995). Accordingly, "[n]o special deference is owed to the district court's determination." Grella v. Salem ______ _____ Five Cent Sav. Bank, 42 F.3d 26, 30 (1st Cir. 1994). ___________________ Similarly, we exercise plenary review over determinations regarding arbitrability. "[A]rbitrability depends on contract interpretation, which is a question of law." PaineWebber Inc. v. Elahi, 87 F.3d 589, 592 (1st Cir. ________________ _____ 1996) (construing Commercial Union Ins. Co. v. Gilbane Bldg. __________________________ _____________ Co., 992 F.2d 386, 388 (1st Cir. 1993)). ___ The Issue Preclusion Question The Issue Preclusion Question _____________________________ In issuing its order to compel arbitration, the district court concluded that the Massachusetts state court judgment precludes Keystone from relitigating the question of arbitrability under the 1989 time charter. On appeal, Keystone maintains that the district court misapplied the issue preclusion doctrine. We disagree. Initially, we note that "[t]he full faith and credit statute, 28 U.S.C. 1738, requires us to give 'the same preclusive effect to state court judgments -- both as to claims and issues previously adjudicated -- as would be given in the state court system in which the federal court sits.'" Kyricopoulos v. Town of Orleans, 967 F.2d 14, 16 (1st Cir. ____________ _______________ 1992) (per curiam) (quoting Willhauck v. Halpin, 953 F.2d _________ ______ 689, 704 (1st Cir. 1991)). Massachusetts law thus governs -9- 9 the preclusion question in this case. However, we have previously recognized that Massachusetts courts "apply the doctrine of issue preclusion in a traditional manner." Willhauck, 953 F.2d at 705 (citing Martin v. Ring, 514 N.E.2d _________ ______ ____ 663, 664 (Mass. 1987); Fireside Motors, Inc. v. Nissan Motor ______________________ ____________ Corp., 479 N.E.2d 1386 (Mass. 1985); Restatement (Second) of _____ Judgments 27 (1982)). Because our cases apply the same traditional preclusion principles that would control in a Massachusetts court, our previous pronouncements in this area of law are persuasive. "The principle of collateral estoppel, or issue preclusion," we have explained, "bars relitigation of any factual or legal issue that was actually decided in previous ________ litigation 'between the parties, whether on the same or a different claim.'" Grella, 42 F.3d at 30 (quoting Dennis v. ______ ______ Rhode Island Hosp. Trust, 744 F.2d 893, 899 (1st Cir. 1984) ________________________ (quoting Restatement (Second) of Judgments 27 (1982))). When the parties in a subsequent action are the same as those in a prior one, a party seeking to invoke the doctrine of issue preclusion needs to establish four essential elements: "(1) the issue sought to be precluded must be the same as that involved in the prior action; (2) the issue must have been actually litigated; (3) the issue must have been determined by a valid and binding final judgment; and (4) the determination of the issue must have been essential to the -10- 10 judgment." Grella, 42 F.3d at 30; accord Ropes & Gray, 65 ______ ______ _____________ F.3d at 981. Each of these elements is present in the instant case. First, the arbitrability of NEP's claims in this case raises the same issue raised in the Massachusetts state cause of action. Keystone ingeniously attempts to argue that there are two separate and distinct arbitrability issues. Keystone in particular maintains that the state court decided that claims against it under the 1989 settlement agreement were arbitrable, but that this case raises a different issue: "whether claims asserted by NEP against Keystone under the 1989 Time Charter and 1995 NEP-IBC Settlement Agreement are arbitrable." Keystone fails to persuade for a very simple, but inescapable, reason. The state court concluded that Keystone was bound to arbitrate claims concerning the Vessel under the 1989 settlement agreement because (1) it was bound to arbitrate such claims under the terms of the executed 1989 time charter, and (2) Keystone had expressly agreed in the 1989 settlement agreement that ownership of the Vessel would pass to Keystone or a Keystone nominee and that the Vessel's new owner would time charter the Vessel to NEP on "terms and conditions agreed to by Keystone and NEP." Because arbitrability of claims concerning the Vessel was one such term and condition in the executed time charter, the state court concluded that the settlement agreement's express -11- 11 language bound Keystone to arbitrate such claims. Put in another fashion, the state court found that Keystone, in the 1989 settlement agreement, had expressly agreed that it or a nominee would execute a time charter on terms and conditions agreeable to Keystone, and thus was bound to arbitrate all disputes because the executed time charter, like the draft charter attached to the settlement agreement and initialed on every page by Keystone, made claims concerning the Vessel arbitrable. Keystone's argument about the 1995 settlement agreement likewise fails to persuade because the parties to the agreement expressly acknowledged that the arbitration clause found in the 1989 time charter would apply and govern the new settlement agreement. While it is true that the settlement agreement provided for the mutual release of claims by Keystone and IBC in favor of NEP and vice versa, the agreement expressly carved out an exception to the general release for "claims, if any, by reason of the Vessel not being in class at the Closing." Because NEP did not release such claims, and because such claims arise under the 1989 settlement agreement and are arbitrable under the terms of that agreement and the 1989 time charter, their arbitrability in the instant case is the very same issue previously litigated and decided in Massachusetts state court. -12- 12 This point carries us to the second element of the issue preclusion standard: the issue raised here on appeal has been "actually litigated." Grella, 42 F.3d at 30. ______ Keystone opposed NEP's motion to dismiss the Massachusetts state cause of action before the state court with briefs, affidavits, and at a motion hearing. Keystone feebly argues that the state court should not have disposed of its cause of action by motion, but instead should have conducted an evidentiary hearing. As NEP correctly notes, the Massachusetts court had before it the relevant contractual documents, read and heard the litigants' opposing views on what meaning and effect should be afforded to those documents and the history of the parties' arbitration efforts, and properly concluded that the arbitrability question could be decided on motion. Well-settled principles of law indicate that the arbitrability issue was actually litigated for preclusion purposes because it was "subject to an adversary presentation and consequent judgment" that was not "a product of the parties' consent and is a final decision on the merits." Jack H. Friedenthal et al., Civil Procedure  ________________ 14.11, at 672, 673 (1985). We thus reach the third and fourth essential elements of collateral estoppel: the issue sought to be precluded must have been determined by a valid and binding final judgment and the issue's determination must have been -13- 13 essential to the judgment. See Ropes & Gray, 65 F.3d at 978; ___ ____________ Grella, 42 F.3d at 30. Keystone does not challenge the ______ validity and binding nature of the state court judgment. Rather, Keystone argues that the state court judgment focused on the 1989 settlement agreement and thus did not determine the arbitrability of NEP's current claims because the court did not decide whether claims against Keystone are arbitrable under either the 1989 time charter or the 1995 settlement agreement. This argument is nothing more than a recycled version of the contention we have just rejected. As we have seen, the state court determined that Keystone was bound to arbitrate under the 1989 settlement agreement because that agreement contemplated the 1989 time charter, which contained a sweeping arbitration clause. The arbitrability of any claims, including NEP's present ones, under the 1989 time charter was an essential component in the state court's prior determination, even if it itself was not the ultimate issue the court decided. As we recently explained, an "issue may be actually litigated and resolved 'even if it is not explicitly decided,' as long as it is logically necessary to [the court's] final decision." Ropes & Gray, 65 F.3d at 982 ____________ (quoting and construing Grella, 42 F.3d at 30-31) (emphasis ______ in original omitted). Our review of the record indicates that the arbitrability of NEP's present claims against Keystone is an -14- 14 issue that has already been litigated and decided by the parties in Massachusetts state court. Under the doctrine of issue preclusion, Keystone cannot seek to undo or redo in federal court what has already been done in state court.  The Merits of the Arbitrability Issue The Merits of the Arbitrability Issue _____________________________________ Our decision today would be the same even if principles of collateral estoppel did not bar Keystone's attempt to relitigate the arbitrability of NEP's current claims against it. Our review of the record and the relevant contractual documents contained therein convinces us that Keystone is bound to arbitrate NEP's claims regarding the Vessel. In view of the detailed factual discussion we have already undertaken, we do not feel it necessary to replay all of the evidence. We shall only briefly explain why we conclude that Keystone is bound to arbitrate such claims as those NEP presently advances. Keystone entered into the 1989 settlement agreement with NEP. In that agreement, Keystone expressly agreed that ownership of the Vessel would pass to it or a Keystone nominee and that the Vessel's new owner would time charter the Vessel to NEP on "terms and conditions agreed to by Keystone and NEP." Attached to the settlement agreement was a draft of the contemplated time charter that Keystone initialed on every page. The draft charter contained a sweeping arbitration clause, which provided that "[a]ny and -15- 15 all differences and disputes of whatsoever nature arising out of this Charter which cannot be resolved by the parties shall be put to arbitration in the City of Boston." Keystone subsequently nominated IBC to take title to the Vessel and IBC, in turn, executed the time charter with NEP that was contemplated in the 1989 settlement agreement. The executed time charter contained the exact same arbitration provision as the draft attached to the settlement agreement. The inescapable conclusion from the foregoing is that Keystone agreed to time charter the Vessel to NEP, via its nominee IBC, under the terms and conditions established in the executed time charter, including the terms and conditions regarding the arbitrability of claims. The 1995 settlement agreement between IBC and NEP does not change this legal state of affairs. Both parties to the agreement expressly acknowledged that the arbitration clause found in the 1989 time charter would govern the new settlement agreement. While the new settlement agreement provided for the mutual release of claims by Keystone and IBC in favor of NEP and vice versa, as we have said, the agreement expressly carves out one exception from this general release. The relevant language could not be more clear: NEP does not release Keystone and IBC from "claims, if any, by reason of the Vessel not being in class at the Closing based upon a survey . . . when the Vessel is -16- 16 drydocked immediately after the Closing." Because NEP does not release such claims against Keystone, and because such claims arise under the 1989 settlement agreement and are arbitrable under the executed time charter contemplated by that earlier settlement agreement, Keystone is obligated to arbitrate NEP's present claims. The fact that Keystone itself did not sign either the 1989 time charter or the 1995 settlement agreement is not dispositive. Keystone is bound by the terms and conditions of the executed time charter because of the commitments it undertook in the 1989 settlement agreement. And the fact that Keystone is not a signatory to the 1995 settlement agreement is nothing more than a clever red herring because that agreement specifically preserves Keystone's prior exposure and liability under the 1989 settlement agreement and time charter, for "claims, if any, by reason of the Vessel not being in class at the Closing." Having weighed the merits vel non of this appeal, ___ ___ we find that the balance swings clearly in NEP's favor. We conclude that NEP's claims are arbitrable and decline Keystone's invitation to visit additional corollary issues. Conclusion Conclusion __________ Principles of collateral estoppel (issue preclusion) raise a bar to Keystone's attempt to litigate the arbitrability of NEP's present claims for recovery of repair -17- 17 costs to the Vessel. Even if this were not the case, NEP's claims against Keystone are arbitrable as a consequence of Keystone's contractual commitments. We thus conclude that the district court's order to compel arbitration was correct. Affirmed. Costs to appellee. Affirmed. Costs to appellee. -18- 18