Quinlan, J.
INTRODUCTION
This is an action by Meredith & Grew, Inc. (“M&G”) against Worcester Lincoln, LLC (“Worcester Lincoln”) and Plaza Properties, LLC (“Plaza Properties”). M&G alleges claims against Worcester Lincoln for breach of contract (Count I), unjust enrichment (Count II), action upon account as stated (Count III), and unfair and deceptive practices pursuant to G.L.c. 93A (Count IV). Plaintiff seeks to recover damages allegedly sustained through Worcester Lincoln’s breach of an express, oral agreement with M&G to act as a mortgage broker on Worcester Lincoln’s behalf. Briefly stated, M&G alleges that it initiated a loan for Worcester Lincoln and Plaza Properties, for which, in breach of oral contract, they have not been paid. Plaintiff further alleges that Worcester Lincoln and/or Plaza Properties engaged in unfair and deceptive practices through its avoidance of payment on the contract.
The matter is before the court on cross motions for summaiy judgment as a matter of law. After a hearing, for the reasons discussed below, the plaintiffs motion for summaiy judgment is DENIED and defendants’ motion for summaiy judgment as to all counts is ALLOWED.

BACKGROUND

The following facts are not materially disputed'. Defendant Plaza Properties is engaged in the business of managing a portfolio of commercial properties, the beneficial interests in which are owned and/or controlled by Harriet Gould and Robert Bogan, as trustees of the Gould Family Trust (the ‘Trusts”). Plaza Properties and Worcester Lincoln are managed by Sam Adams, who is a potential beneficiaiy and/or remain-derman of the Trusts. Defendant Worcester Lincoln is one of at least fifteen entities that hold title to commercial properties owned and/or controlled by the Trusts. Worcester Lincoln holds record title to a forty-five-acre shopping center, currently being redeveloped, known as Lincoln Plaza. Sam Adams and Plaza Properties aire responsible for the management of Lincoln Plaza on behalf of the Trusts.
On or about July 1999, Sam Adams engaged M&G to locate a lender who would be willing to refinance the existing debt upon the Lincoln Plaza Property, and to advance additional funds, which would be used to finance the construction of an expansion of the Lincoln Plaza property. Plaza Properties, which held a lease on the property at the time, acted as the promoter of the Lincoln Plaza project, and Lincoln Plaza Group would be the owner/borrower on the loans. From prior engagements, Worcester Lincoln’s officers and agents knew that M&G charged for its services on a contingent commission basis, the fee typically being calculated as 1% of the amount loaned, payable at closing.
The First Loan
M&G invested its efforts and used its contacts in the real estate industiy to find a lender for the defendants. In or about August 1999, M&G succeeded in obtaining from Dime CRE, Inc. (“Dime”) a term sheet outlining the terms and conditions upon which Dime proposed to offer a lending commitment responsive to the defendants’ needs identifying Lincoln Plaza Group as the borrower. The project which Dime evaluated consisted of the conversion of the Lincoln Plaza into a regional “power center.” Dime conditioned the availability of the mortgage funding upon the defendants’ satisfaction of certain financial requirements, including requirements concerning leases of the Lincoln Plaza property. In or about September 1999, the defendants decided to name Worcester Lincoln as the entity which would actually reacquire title to the shopping center from the previous lender and become the borrower upon the new loan.
Owing directly to M&G’s initial efforts to introduce the defendants to Dime, Worcester Lincoln obtained a loan which allowed it to refinance the existing mortgage debt on Lincoln Plaza. Dime CRE referred to this as a “bridge loan,” made with the understanding that Plaza Properties and Worcester Lincoln would apply to Dime for the full financing of the “power center” project originally envisioned. After the loan, the Shopping Center realty was transferred to Worcester Lincoln. Lincoln Plaza Group no longer had any management responsibility in the Shopping Center. The defendants paid M&G a commission, in the amount of $101,250.00,[2] in connection with this advance of borrowed funds.
The Second Loan
Over one year later, on September 29, 2000, Worcester Lincoln closed upon a loan from Dime in the total amount of $38.5 million. The loan was intended to finance the same “power center” project originally described in a brochure M&G developed in order to secure the first loan.[3] Neither Worcester Lincoln nor Plaza Properties has paid any commission to M&G for the procurement of the second loan.
Action Against Lincoln Plaza Group
On February 26, 2001, M&G initiated an action against Lincoln Plaza Group seeking to collect the debt on the second loan.[4] Lincoln Plaza Group did not respond to the complaint and a judgment entered by default in the amount of $265,000. After Lincoln Plaza Group refused to pay the execution, M&G took postjudgment discoveiy and learned for the first time that Lincoln Plaza Group was no longer functioning as a business entify. Defendants now claim that Lincoln *413 Plaza Group has no assets and has not conducted any business since sometime in the year 2000. M&G claims that the benefit of their work in securing the first loan accrued to Worcester Lincoln and Plaza Properties when they used Dime to in order to secure the second loan. Therefore, M&G contends, Worcester Lincoln’s and/or Plaza Properties’ failure to compensate M&G for the second loan constitutes, inter alia, breach of contract.

THE STANDARD FOR SUMMARY JUDGMENT

Under Mass.R.Civ.P. 56(c), summary judgment becomes appropriate if no material facts are disputed and if the moving party is entitled to judgment as a matter of law. See e.g. Highland Ins. Co. v. Aerovox, Inc., 424 Mass. 226, 232 (1997). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue and the legal entitlement to judgment in its favor. Pederson v. Time, Inc., 404 Mass. 14, 16, 17 (1989). A moving party which does not bear the burden of proof at trial' is entitled to summary judgment if it submits affirmative evidence, unmet by countervailing materials, that either negates an essential element of the nonmoving party’s case or demonstrates that the nonmoving party has no reasonable expectation of proving an essential element of its case. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). The opposing party cannot rest on the pleadings or on mere assertions of disputed facts to defeat the summary judgment motion. “If the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact ...” Pederson, 404 Mass. at 17. Finally, in its inspection of the summary judgment record, the court must credit facts in the light most favorable to the opposing party. Bisson v. Eck, 430 Mass. 406, 407 (1999); Gray v. Giroux, 49 Mass.App.Ct. 436, 437 (2000). Where “there is no real dispute as to the salient facts or if only a question of law is involved,” summary judgment shall be granted to the party entitled to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983).

DISCUSSION

Collateral Estoppel/Issue Preclusion

M&G argues that Worcester Lincoln is equitably estopped and barred by the prior default judgment against Lincoln Plaza Group, Meredith & Grew, Inc. v. Lincoln Plaza Group, LLC., Suffolk Super. Ct. No. 01-00919-B, because the defendants have an identity of issues and are in privity with the Lincoln Plaza Group. The doctrine of issue preclusion provides that when an issue has been “actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties whether oh the same or different claim.” Cousineau v. Laramee, 388 Mass. 859, 863 n.4 (1983), quoting Restatement (Second) of Judgments §27 (1982). “(P)reclusive effect should not be given to issues or claims that were not actually litigated in the [the] prior action.” Jarosz v. Palmer, 436 Mass. 526, 531 (2002), quoting Treglia v. MacDonald, 430 Mass. 237, 241 (1999). An evidentiary hearing or trial is not required before issue preclusion is applied. Id. The appropriate question is whether the issue was “subject to an adversary presentation and consequent judgment that was not a project of the parties’ consent...” Id., quoting Keystone Shipping Co. v. New England Power Co., 109 F.3d 46, 52 (1st Cir. 1997).
A default judgment has no preclusive effect because the issue was never actually litigated. “In the case of a judgment entered by . . . default, none of the issue is actually litigated.” Restatement (Second) of Judgments §27 comment e, p. 257. See also Barkan v. Mass. Insurer’s Insolvency Fund, 50 Mass.App.Ct. 1108 (2000) (unpublished) (as the default did not result in a decision on the merits relative to issues raised in the action, issue preclusion was inappropriate). Since a judgment entered by default does not apply with respect to any issue litigated in a subsequent action, plaintiffs motion for summaiyjudgment as to issue preclusion must fail.[5]

Breach of Contract

Owing directly to M&G’s initial efforts to introduce Lincoln Plaza Group to Dime, Worcester Lincoln obtained a loan from them which allowed it to refinance the existing mortgage debt on Lincoln Plaza. Ultimately, Worcester Lincoln secured a $38.5 million loan from Dime. M&G alleges that this second loan was a direct and proximate result of the services it furnished, pursuant to its initial efforts to introduce the defendants to Dime, and defendants, in breach of contract, failed to compensate them for such services.
G.L.c. 259, §7 provides:
Any agreement to pay compensation for service as a broker or finder or for service rendered in negotiating a loan or in negotiating the purchase, sale or exchange of a business, its good will, inventory, fixtures, or an interest therein, including a majority of voting interest in a corporation, shall be void and unenforceable unless such agreement is in writing, signed by the party to be charged therewith, or by some other person authorized. For the purpose of this section, the term “negotiating” shall include identifying prospective parties, procuring an introduction to a party to the transaction or consummation of the transaction.
It is undisputed that the above general requirement of a writing applies to the type of services M&G allegedly rendered: however, M&G argues that the exception for real estate brokers removes this contract from the statute of frauds. The remainder of G.L. 259, §7 provides as follows:
*414 The provisions of this section shall apply to a contract implied in fact or in law to pay reasonable compensation but shall not apply to a contract to pay compensation for professional services of... a licensed real estate broker acting in their professional capacity.
The only remaining question is whether the services which M&G provided were the result of actions in their professional capacity as a real estate broker. The loan at issue, the second loan, was obtained from Dime for the redevelopment of the shopping center at Lincoln Plaza Group. “Real estate broker” is statutorily defined as follows:
“Real estate broker,” hereinafter referred to as broker, any person who for another person and for a fee, commission or other valuable consideration, or with the intention or in the expectation or upon the promise of receiving or collecting a fee, commission or other valuable consideration, does any of the following: — sells, exchanges, purchases, rents or leases, or negotiates, or offers, attempts or agrees to negotiate the sale, exchange, purchase, rental or leasing of any real estate, or lists or offers or attempts or agrees to list any real estate, or buys or offers to buy, sells or offers to sell or otherwise deals in options on real estate, or advertises or holds himself out as engaged in the business of selling, exchanging, purchasing, renting or leasing real estate, or assists or directs in the procuring of prospects or the negotiation or completion of any agreement or transaction which results or is intended to result in the sale, exchange, purchase, leasing or renting of any real estate. G.L.c. 112, §87PP.
Nothing in this definition can be interpreted to include the negotiating of a redevelopment loan within the definition of “real estate broker.” In regards to the second loan, M&G does not demonstrate that it assisted or directed “the procuring of prospects or the negotiation of any agreement or transaction which results or is intended to result in the sale, exchange, purchase, leasing, or renting of any real estate.” Id. In its own memorandum of law, M&G merely states that the defendants engaged it to find a lender who would be willing to refinance the existing debt on the Lincoln Plaza Property; buy out the existing leases at the property; and finance construction for an expansion of the Lincoln Plaza property.
Furthermore, the Legislature removed the type of loan M&G allegedly helped procure from its definition of “real estate broker.” St. 1991, c. 144, §1, effective Jan. 1, 1992, specifically deleted from the definition of real estate broker the following language: “or negotiates or offers or attempts or agrees to negotiate a loan secured or to be secured by mortgage or other encumbrance upon real estate.” The fact that the plaintiff is a real estate broker is not enough to take this case outside of the statute of frauds. Relying on the statu-toiy definition, this court declines to find that a real estate broker’s attempts to refinance the existing debt and negotiate a construction loan secured by real estate is “acting within their professional capacity.” As such, M&G’s business activities, as they related to Lincoln Plaza Group, were outside of its capacity of a real estate broker, and such loans, even if procured by a licensed real estate broker, do not fit within the exclusion provided for by G.L.c. 259, §7. Since M&G does not fit within the exception, the contract must be in writing. Consequently, both M&G’s breach of contract and implied contract claims fail for failure to satisfy the requirements of G.L.c. 259, §7.[6]

Action for Account as Stated

An action for an account as stated “is an acknowledgment of the existing condition of liability between the parties. From it the law implies a promise to pay whatever balance is thus acknowledged to be due. It thereby becomes a new and separate cause of action, so far as that recoveiy may be had upon it without setting forth or proving separate items of liability from which the balance results.” Rizkalla v. Abusamra, 284 Mass. 303, 307 (1933), quoting Chace v. Trafford, 116 Mass. 529, 532 (1875).
Although an action for an account as stated can stand on its own, the plaintiff fails to allege that the defendant “acknowledged the existing condition of liability.” To the contrary, the plaintiff here annexed the account as stated claim to the implied contract claim. To recover on ihis theory, the plaintiff must show that there was an implied contract to pay the plaintiff if he did the work according to the contract. Altman v. Goodman, 255 Mass. 41, 44 (1926) (when an action for an account as stated is “merely an alternative way of alleging quantum meruit, defendant’s argument as to quantum meruit applies here with equal force”). Therefore, on the facts of this case and in these circumstances, plaintiff s action for an account as stated necessarily depends on the implied contract claim. Since the implied contract claim does not survive summary judgment, the concomitant action for an account as stated fails with it.

Unfair and Deceptive Practices

Section 11 of Chapter 93A does not define what conduct rises to the level of unfair or deceptive act. Therefore, in deciding questions of unfairness under G.L.c. 93A this court must examine the “nature of [the] challenged conduct and the purpose and effect of that conduct as the crucial factors in making a G.L.c. 93A fairness determination.” Massachusetts Employers Insurance Exchange v. Propac-Mass. Inc., 420 Mass. 39, 42-43 (1995).[7]
To the extent M&G’s c. 93A claim is derivative of its breach of contract and quantum meruit claims, that claim does not survive summary judgment. Cantell v. Hill Holliday Connors, 55 Mass.App.Ct. 550, 556 (2002), citing Duclersaint v. Federal Natl. Mort. Assn., 427 Mass. 809, 814 (1998) (“a good faith dispute as to *415 whether money is owed, or performance of some kind is due, is not the stuff of which a c. 93A claim is made”). While a mere breach of contract, without more, does not violate c. 93A, conduct in disregard of known contractual arrangements and intended to secure benefits for the breaching party will constitute unfair or deceptive practices for the purposes of the statute. Anthony’s Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 474 (1991).
Under these circumstances, the plaintiffs c. 93A claim can survive independent of other causes of action. The Supreme Judicial Court has said that G.L.c. 93A “creates ‘broad new rights, forbidding conduct not previously unlawful under the common law of contract and tort under any prior statute.’ ” Linkage Corp. v. Trustees of Boston Univ., 425 Mass. 1, 27 (1997), quoting Dodd v. Commercial Union Ins. Co. 373 Mass. 72, 78 (1977). See Patricia Kennedy & Co. v. Zam-Cul Enters., Inc., 830 F.Sup. 53, 59 (D.Mass. 1993) (“a claim under Chapter 93A rises or falls on its own merit”).
The plaintiff argues that defendant’s refusal to pay the alleged debt, the default on the suit against Lincoln Plaza Group, and Lincoln Plaza Group’s transfer of its right to acquire Lincoln Plaza to Worcester Lincoln constituted intentional, wilful, and deliberate violations of its contractual obligation to compensate M&G for services rendered. This court disagrees. From the record, it appears that the defendant and the plaintiff had a genuine issue of opinion about whether money was owed, making this “an ordinary . . . dispute without conduct that was unethical, immoral, oppressive, or unscrupulous.” Duclersaint, 809 Mass. at 814, quoting Kobayashi v. Orion Ventures, Inc., 42 Mass.App.Ct. 492, 505 (1997). There is nothing in the record to indicate that the defendant acted unfairly. Id. Moreover, the defendant did not deceive the plaintiff in any way, it simply held a different opinion as to whether money was owed. Therefore, plaintiff fails to raise an issue of fact materially in dispute which demonstrated that defendant committed an unfair or deceptive practice for the purposes of G.L.c. 93A.

ORDER

For the foregoing reasons, plaintiffs motion for summary judgment is DENIED, and defendant’s motion for summary judgment is ALLOWED.

Plaintiff allegedly discounted the fee for this loan to three-fourths of one percent (0.75%) at defendant’s request and in consideration of defendants’ continuing patronage.

Worcester Lincoln disputes this fact: “The loan was for the purpose of redevelopment of the shopping center as proposed in September 2000, which proposal was much different from the original proposal of September 1999.” Furthermore, Worcester Lincoln claims that it, on its own, identified financing sources to replace the first loan. “Several lending institutions were approached with financing proposals and one or more brokers other than Meredith & Grew were contacted and/or engaged to seek refinancing. Ultimately, negotiations with Dime resulted in the 2000 loan without Plaintiffs assistance.”

Meredith & Grew, Inc. v. Lincoln Plaza Group, LLC., Suffolk Super. Ct. No. 01-00919-B.

Defendant also argues that because M&G, in C.A. 01-0919, averred in its complaint that it entered the contract with Lincoln Plaza Group, it is now judicially estopped from asserting a contract between itself and Worcester Lincoln and Plaza Properties. The court need not address this issue because it grants summary judgment for the defendant on other grounds. However, judicial estoppel is limited to those circumstances in which a party has successfully maintained a position at a prior proceeding and seeks to “use the judicial process in an inconsistent way the court should not tolerate.” Fay v. Fed. Nat’l Mortgage Ass’n, 419 Mass. 783, 783, 788 (1995). Without deciding the issue today, this court would be hesitant to identify a default judgment as representing “success” for the purposes of judicial estoppel. See also East Cambridge Sav. Bank v. Wheeler, 422 Mass. 621, 623 (1996) (declining to apply judicial estoppel to a settlement approved by the bankruptcy court).

M&G argues that even if its breach of contract claim is barred by G.L.c. 259, §7, its quantum memit claim nonetheless survives. However, G.L.c. 259, §7 explicitly states: “The provisions of this section shall apply to a contract implied in fact or in law to pay reasonable compensation .. .” Since the statute explicitly precludes a quantum meruit claim in these circumstances, that claim does not survive summary judgment.

In Propac-Mass, Lnc., the Supreme Judicial Court criticized as “uninstructive” the previously used “level of rascality” test set out in Levings v. Forbes & Wallace, Inc., 8 Mass.App.Ct. 498, 504 (1979). Similarly, the Court rejected the “rancid flavor of unfairness” test established in Atkinson v. Rosenthal, 33 Mass.App.Ct. 219, 226 (1992).