**In re Richard B. SLOSBERG, Debtor.**

**Dennis H. McALISTER, Plaintiff,**

v.

**Richard B. SLOSBERG, Defendant.**

Bankruptcy No. 97–20908.
Adversary No. 97–2071.

United States Bankruptcy Court,
D. Maine.

Sept. 25, 1998.

Joseph L. Goodman, Portland, ME, for debtor.

Stephen B. Wade, Skelton, Taintor & Abbott, Auburn, ME, for plaintiff.

## MEMORANDUM OF DECISION DENYING PLAINTIFF'S SUMMARY JUDGMENT MOTION

JAMES B. HAINES, Jr., Chief Judge.

Plaintiff Dennis McAlister contends that his pre-bankruptcy state court judgment against Defendant Richard Slosberg, his former attorney, determined all issues pertinent to his averments that Slosberg's obligations to him are nondischargeable under § 523(a)(6). Slosberg, a Chapter 7 debtor, asserts that the state court judgment does not carry preclusive effect in this dischargeability action because it was entered by default.

For the reasons set forth below, I conclude that the state court judgment does not entitle McAlister to judgment as a matter of law and deny his summary judgment motion.[1]

### BACKGROUND

*History of the Litigation*

*A. Round One: Slosberg's Sloth*

In 1990, after unsuccessfully defending a state court paternity action, McAlister retained Slosberg to prosecute an appeal. The two kept in regular contact for approximately two years, meeting in person ten to twenty times.

While the paternity appeal was pending, McAlister was charged with operating a vehicle while under the influence of intoxicating liquor. He hired Slosberg to defend him. After Slosberg thrice failed to appear at motion hearings in that case, McAlister hired a new lawyer. The new attorney checked on the paternity appeal and reported to McAlis-

---

1. This memorandum sets forth my conclusions of law in accordance with Fed.R.Civ.P. 52 and Fed. R.Bankr.P. 7052. Unless otherwise indicated, all citations to statutory sections are to the Bankruptcy Reform Act of 1978 ("Bankruptcy Code" or "Code"), as amended, 11 U.S.C. § 101, *et seq.*

ter that it had been dismissed for failure to prosecute.

### B. Round Two: Slosberg Slips Up

McAlister sued Slosberg for malpractice. Slosberg managed his own defense no better than he had represented McAlister. As a sanction for failing to comply with a discovery order, the state court defaulted Slosberg.

A jury trial on damages followed. The jury awarded McAlister compensatory damages for mental distress ($3,800.00) and punitive damages ($19,000.00) based on a determination that Slosberg acted with malice. In addition, it awarded him legal fees and costs ($3,510.00) and lost wages ($800.00), for a total award of $27,110.00. The court denied Slosberg's trio of post-trial motions.

### C. Round Three: Slosberg Stifled on Appeal

Slosberg appealed to the Supreme Judicial Court of Maine, challenging the lost wages, mental distress, and punitive damages awards. See McAlister v. Slosberg, 658 A.2d 658 (Me.1995). The court affirmed Slosberg's liability because the lower court's default order established all the allegations in McAlister's complaint as true. See id. at 660. And, concluding that all damages issues were properly placed before the jury, it left the damages awards undisturbed. See id.

### D. Round Four: Slosberg Seeks Solace in Bankruptcy

Slosberg next filed a voluntary Chapter 7 petition. McAlister initiated an adversary proceeding seeking a determination that Slosberg's obligations to him are excepted from discharge because they constitute damages for willful and malicious injury within the meaning of § 523(a)(6) or, alternatively, because they are damages arising from fiduciary fraud or defalcation within the meaning of § 523(a)(4).

### Summary Judgment Arguments

McAlister's asserts that he is entitled to summary judgment because, taken together, the state court default order and damages verdict preclude evidentiary contest of any factual issues material to the elements of his § 523(a)(6) and (a)(4) claims. More specifically, he contends that the state court's finding of "malice" (as that term is defined in Maine law) was a finding essential to the jury's punitive damage award and that such a finding comprehends all elements of § 523(a)(6) willfulness and maliciousness.

In addition, McAlister argues that Slosberg's admitted acceptance of a retainer for services he failed to render, the jury verdict, and an administrative order directing repayment of the retainer[2] compel summary judgment in his favor on the § 523(a)(4) fiduciary defalcation count.

Slosberg asserts that the state court default judgment has no issue preclusion potency under Maine law because there was no actual litigation of the facts upon which McAlister's recovery was based (i.e., because they were "deemed admitted" by default). Further, he asserts that use of a default-driven judgment to establish facts in subsequent bankruptcy dischargeability litigation does violence to the Bankruptcy Code's fresh start policies. As to the jury's findings, he argues that the trial judge never put the question of malice to the jury; rather, the jury was instructed that malice and negligence were deemed proven by default and that the judge gave malice instructions only "to place the jury in a better position to assess the damages." Thus, he contends, there was no "finding" of malice by the jury. Furthermore, Slosberg argues that, even if the jury did make a finding of malice en route to its punitive damages award, the definition of malice under Maine law does not subsume § 523(a)(6)'s substantive content. Thus, in Slosberg's view, a pre-bankruptcy finding of malice in support of a punitive damage award in a Maine civil suit does not

---

2. After filing bankruptcy Slosberg was subject to disciplinary action by the Maine Board of Overseers of the Bar. As a result of fee arbitration in that venue Slosberg was ordered to repay McAlister the $3510 retainer. While McAlister suggests that this determination has preclusive effect vis-a-vis his § 523(a)(4) claim he has not included the Board's order or record in his summary judgment papers.

foreclose subsequent litigation of § 523(a)(6) dischargeability issues.

Slosberg did not brief the § 523(a)(4) issues.

## DISCUSSION

*Summary Judgment Standard*

I will grant McAlister's summary judgment motion if, on the basis of the complete summary judgment record before me, "there is no genuine issue as to any material fact" and he is entitled to judgment "as a matter of law." Fed.R.Civ.P. 56(c). *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Euromotion, Inc. v. BMW of North America, Inc.,* 136 F.3d 866, 869 (1st Cir.1998); *Poor v. Chase Manhattan Bank USA, N.A. (In re Poor),* 219 B.R. 332, 333 (Bankr.D.Me.1998). To successfully counter McAlister's motion, Slosberg must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See, e.g., Barbour v. Dynamics Research Corp.,* 63 F.3d 32, 37 (1st Cir.1995); *In re Poor,* 219 B.R. at 334. I view the record in a light most favorable to Slosberg, the party opposing summary judgment, and indulge all reasonable inferences in his favor. *See, e.g., Euromotion, Inc.,* 136 F.3d at 869; *In re Poor,* 219 B.R. at 334.

*Issue Preclusion in Dischargeability Proceedings*

The principle of issue preclusion prevents parties from relitigating issues finally determined elsewhere. *See Aetna Casualty & Surety Co. v. Markarian (In re Markarian),* 208 B.R. 249, 251 (1st Cir. BAP 1997); *see also Spickler v. York,* 505 A.2d 87, 88 (Me. 1986) (Maine law).[3] In dischargeability actions, bankruptcy courts must recognize issue preclusion based on pre-bankruptcy state court determinations. *See* 28 U.S.C. § 1738 (requiring that the federal courts give full faith and credit to judicial proceedings of state courts); *see also Grogan v. Garner,* 498 U.S. 279, 284 n. 11, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Reynolds–Marshall v. Hallum,* 162 B.R. 51, 55 (D.Me.1993); *(In re Markarian),* 208 B.R. at 251; *Applebee v. Brawn (In re Brawn),* 138 B.R. 327, 329–30 (Bankr.D.Me.1992). I can give the state court judgment no greater preclusive effect than it carries under Maine law. *See John-*

---

**3.** Because dischargeability questions are unique to bankruptcy and their resolution depends on criteria established by the Bankruptcy Code, prior or state court judgments will never relate to the same "cause of action" so as to present the potential for claim preclusion.

The Supreme Court has explained the distinctions between claim and issue preclusion:

[W]e use the term "claim preclusion" to refer to "res judicata" in a narrow sense, *i.e.,* the preclusive effect of a judgment in foreclosing litigation of matters that *should have been raised* in an earlier suit. In contrast, we use the term "issue preclusion" to refer to the effect of a judgment in foreclosing relitigation of a matter that *has been litigated* and decided. *Marrese v. American Academy of Orthopaedic Surgeons,* 470 U.S. 373, 376 n. 1, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985) (emphasis added). *See also Brown v. Felsen,* 442 U.S. 127, 139 n. 10, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979); *Machias Savs. Bank v. Ramsdell,* 689 A.2d 595, 599 (Me. 1997); *Beegan v. Schmidt,* 451 A.2d 642, 643–44 & n. 1 (Me.1982) (cases drawing the analytical distinction between claim and issue preclusion). Claim preclusion comprehends matters that were "or might have been" litigated. *See Dow v. Adams,* 707 A.2d 793, 797 (Me.1998); *Camps Newfound/Owatonna Corp. v. Town of Harrison,* 705 A.2d 1109, 1113 (Me.1998); *Johnson v. Samson Constr. Corp.,* 704 A.2d 866, 868 (Me.1997);

*Irving Pulp & Paper v. Kelly,* 654 A.2d 416, 418 (Me.1995); *Spickler v. Dube,* 644 A.2d 465, 467 (Me.1994); *Beegan,* 451 A.2d at 644. Indeed, claim preclusion analysis often revolves around the question whether matters in the later action, left unasserted in the prior action, "present[ ] the same 'cause of action.' " *Id.* at 645 (review of the meaning of cause of action and Maine's "transactional test"). *See also Camps Newfound/Owatonna Corp.,* 705 A.2d at 1113–14 (distinguishing issue preclusion from the claim preclusion argument before it and emphasizing that parties should not be able to split causes of action into separate lawsuits); *Johnson,* 704 A.2d at 868–69 (observing that the policies behind claim preclusion "demand" preventing a litigant from "splintering" claims).

Although some elements of state court claims may be identical with elements of discharge exceptions (*e.g.,* common law fraud and § 523(a)(2)(A)), *see Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), a claim to establish nondischargeability (in a bankruptcy that is yet to occur) is not among the claims that could have been asserted in pre-bankruptcy litigation. Thus, although the right to a judgment of nondischargeability may well be established by a pre-bankruptcy judgment, it results from a comprehensive preclusion of the *elements* of the claim, not from a preclusion of the *claim* itself. *See Brown,* 442 U.S. at 139 n. 10, 99 S.Ct. 2205.

son v. De Grandy, 512 U.S. 997, 1005, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994); Lundborg v. Phoenix Leasing, Inc., 91 F.3d 265, 270 (1st Cir.1996).

McAlister's motion raises the question whether his state court judgment, a hybrid creature with characteristics of a default judgment and those of a jury verdict, is constituted of the stuff that can carry issue preclusive effects. This inquiry is problematic, but I will touch upon it briefly. It also raises the question whether such issue preclusive effects as it may carry coincide with determinative elements of McAlister's claims of § 523(a)(6) and § 523(a)(4) nondischargeability.

Recent developments in bankruptcy law demonstrate that the state court did not resolve issues determinative of McAlister's § 523(a)(6) dischargeability claim. Thus, even were I to assume that a state court judgment of this ilk could operate with issue preclusive force in subsequent litigation presenting overlapping, material factual issues, I conclude that it does not do so in the case before me. As neither McAlister's argument nor the record adequately supports his entitlement to preclusion on the § 523(a)(4) claim, he falls short there, as well.

### A. Standard for Issue Preclusion

 Maine law determines the preclusive effects of McAlister's state court judgment. See Matsushita Elec. Indus. Co., Ltd. v. Epstein, 516 U.S. 367, 375, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996); Marrese, 470 U.S. at 380, 105 S.Ct. 1327; Keystone Shipping Co. v. New England Power Co., 109 F.3d 46, 50 (1st Cir.1997); Reynolds–Marshall, 162 B.R. at 55. In order to carry preclusive force, the prior judgment must meet a four-pronged test: (1) The issues McAlister seeks to avoid relitigating here must be the same as those involved in the state court malpractice action; (2) Those issues must have been actually litigated in the malpractice suit; (3) The determination(s) McAlister relies upon must

be part of a binding and final judgment(s); and (4) The determinations must have been essential to the state court judgment. See Sargent v. Buckley, 697 A.2d 1272, 1274 (Me. 1997); Morton v. Schneider, 612 A.2d 1285, 1286 (Me.1992) (quoting Sevigny v. Home Builders Ass'n of Maine, Inc., 429 A.2d 197, 201–02 (Me.1981), outlining three prongs, combining prongs one and two); see also In re Brawn, 138 B.R. at 330 (bankruptcy court outlining Maine's four-pronged preclusion analysis); cf. In re Markarian, 208 B.R. at 251 (same elements); Eppard v. Sestito (In re Sestito), 136 B.R. 602, 604 (Bankr.D.Mass. 1992) (same elements).

### 1. Issue Preclusion by Default

McAlister asserts that the facts established by Slosberg's default, along with facts found by the jury in connection with its damage determination, entitle him to judgment. My focus must be on both the structure of the judgment and its factual underpinnings. See Matsushita Electric Indus. Co., Ltd., 516 U.S. at 375, 116 S.Ct. 873 (looking at the state law on giving preclusive effect to settlement agreements); D'Amario v. Butler Hosp., 921 F.2d 8, 10 (1st Cir.1990) (examining state law regarding the preclusive effect of a consent judgment).

Whether Maine courts would give McAlister's judgment issue-preclusive effect in a second action against Slosberg is not crystalline. The question of the preclusive effect of facts established by default was left unanswered in Forbes v. Wells Beach Casino, Inc., 409 A.2d 646 (Me.1979). After declaring that entry of default transformed the plaintiff's allegations into factual findings, the court observed that the fact finder had based its findings on evidence, rather than upon the earlier-entered default. See id. at 652. Thus, it did not address the question whether a default-determined fact carries issue preclusive power in subsequent litigation. See id. ("We need not, therefore, reach the issue of whether an estoppel could have been appropriately invoked in this case.").[4]

4. The Forbes court's analysis is befuddling. Although it skirts the issue, it describes it as one of "collateral estoppel," id., and refers to earlier precedent abandoning mutuality as a requirement for issue preclusion. See id.; Hossler v.

Barry, 403 A.2d 762, 766–70 (Me.1979) (case cited by the court in Forbes). But Forbes makes it clear that the default determination the plaintiff invoked was rendered, albeit much earlier, in the same case as was on appeal. Thus, although

The Law Court has addressed the operation of default judgments for *claim* preclusion, but it has not visited the question of default judgments and *issue* preclusion since *Forbes*.[5]

There are good reasons to question the sufficiency of default judgments for issue preclusion purposes, particularly in the bankruptcy context. Among other things, it is not unnatural, on the eve of bankruptcy, for a prospective debtor to ignore pending complaints and litigation (and, as a result, to suffer defaults) with the expectation that a bankruptcy discharge will provide salvation.[6] Uncritical application of issue preclusion springing from default determinations might lead to dischargeability becoming a function of the pleader's craft, rather than of factual findings based on evidence. *See* Charles Jordan Tabb and Robert M. Lawless, *Of Commas, Gerunds, and Conjunctions: The Bankruptcy Jurisprudence of the Rhenquist Court*, 42 Syracuse L.Rev. 823, 865–66 (1991) (criticizing *Grogan*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755, for its collateral estoppel implications). At the same time, I recognize that bankruptcy courts are bound by statute and precedent requiring them to give effect to state court judgments pursuant to state law principles. *See* 28 U.S.C. § 1738 (requiring federal courts to give full faith and credit to state court judgments); *see generally*, Tisha Morris Federico, *Dischargeability Proceedings and Prepetition Default Judgments: Does Bankruptcy Code Implicitly Repeal the Full Faith and Credit Requirements of 28 U.S.C. § 1738?*, 71 Am.Bankr. L.J. 563 (1997); Hon. Bernice B. Donald and

---

law-of-the-case principles might have pertained, issue preclusion principles could not. *See Marrese*, 470 U.S. at 376 n. 1, 105 S.Ct. 1327; *Brown*, 442 U.S. at 139 n. 10, 99 S.Ct. 2205.

5. Under Maine law, default judgments operate for claim preclusion purposes. *See Lundborg*, 91 F.3d at 270 (observing that under Maine law "a default judgment has the same claim-preclusive effect as a judgment on the merits"); *Irving Pulp & Paper Ltd.*, 654 A.2d at 418 ("A judgment by default is just as conclusive on the rights of the parties as a judgment on a demurrer or verdict.").

As to default determinations and issue preclusion, there is no definitive answer in Maine or in the First Circuit. Indications in Maine are that *issue* preclusion may not properly flow from default judgments. *See Larochelle v. Hodsdon*, 690 A.2d 986, 988–89 (Me.1997) (real estate broker had no incentive to raise legal malpractice issues against his attorney in earlier litigation brought by third party and in earlier administrative proceedings; thus, attorney could not invoke findings from earlier proceedings to establish that broker was solely at fault); *State v. Lewry*, 550 A.2d 64, 65 (Me.1988) (default order in license suspension proceeding cannot be given preclusive effect in subsequent criminal prosecution; it did not result from actual litigation). *Cf. Rose v. Ryder Truck Rental, Inc.*, 662 F.Supp. 177, 179 (D.Me.1987) (Maryland workers compensation award did not estop employer from defending third-party *respondeat superior* liability action by contending that its employee was not within scope of employment at time of accident; "Default judgments have no collateral estoppel effect," citing *Restatement (Second) of Judgments* § 24, comment e (1980)). The First Circuit has but tested the waters. *See United States v. Palmer*, 956 F.2d 3, 7 (1st Cir.1992) (concern that a default judgment may later be used against a party is "sheer speculation" and does not qualify as "manifest injustice" necessary to overcome a serious procedural default).

6. The standard for issue preclusion includes the requirement that the issue on which preclusion is sought has been actually litigated. *See Sargent*, 697 A.2d at 1274 ("actually litigated on the merits"); *Lewry*, 550 A.2d at 65 ("actual litigation of ... issue on the merits"); *Spickler*, 505 A.2d at 88 ("essential fact or issue actually litigated on the merits").

Issues determined by default have not been litigated on the merits. But, as was the case in McAlister's state court suit against Slosberg, default may follow joinder of the issues and may precede evidentiary hearings in which the defaulted party participates. In situations where a party is defaulted after answering the complaint (*e.g.*, for failure to obey discovery orders, failure to attend trial), the defaulted party might be seen as having forfeited its opportunity to litigate and, therefore, issue preclusion should obtain. *See Gillman v. Department of Human Serv.*, 711 A.2d 154, 156 (Me.1998) (recent Maine Supreme Court decision applying issue preclusion, phrasing the litigation prong as "a fair opportunity to litigate the issue."). In the bankruptcy context, at least one court has recognized that when post-default proceedings include evidentiary hearings on damages, collateral estoppel will apply. *Compare Gober v. Terra + Corp. (In re Gober)*, 100 F.3d 1195 (5th Cir.1996) (collateral estoppel applied where debtor had been defaulted after two years of state court litigation and court heard evidence regarding character of debtor's conduct and damages), *with Pancake v. Reliance Ins. Co. (In re Pancake)*, 106 F.3d 1242 (5th Cir.1997) (collateral estoppel would not apply as to default judgment similarly entered where record did not demonstrate post-default evidentiary hearings had been held).

Kenneth J. Cooper, *Collateral Estoppel in Section 523(c) Dischargeability Proceedings: When is a Default Judgment Actually Litigated?*, 12 Bankr.Dev.L.J. 321 (1996). The problem is nettlesome.

■ For today, there is a path out of the issue preclusion thicket: Even were I to conclude that, given its character, McAlister's pre-bankruptcy judgment could fill his quiver with issue preclusion arrows, that conclusion would not carry the day for him. This is so because a careful review of Maine law and elements of § 523(a)(6) discloses that the state court judgment did not resolve the *same issues* as his dischargeability complaint presents. *See e.g., Gillman,* 711 A.2d at 156 ("A prior judgment can be used for collateral estoppel only if the identical issue necessarily was determined by a prior final judgment."); *see also Hamilton v. Nolan (In re Nolan),* 220 B.R. 727, 731 (Bankr.D.C.1998) ("When elements needed to determine nondischargeability are sufficiently distinct from elements of a state court proceeding, the state court judgment will not preclude, on collateral estoppel grounds, determination of nondischargeability of debt.").

Unfortunately, the path out of the first thicket traverses a briar patch all its own.

*B. Elements of § 523(a)(6) Nondischargeability*

Section 523(a)(6) excepts from the individual debtor's discharge "any debt . . . for willful and malicious injury by the debtor to another entity or to the property of another entity." § 523(a)(6).

■ "Willful" and "malicious" are distinct elements in the § 523(a)(6) analysis. *See Reynolds–Marshall,* 162 B.R. at 55–56; *Allstate Ins. v. Dziuk (In re Dziuk),* 218 B.R. 485, 487 (Bankr.D.Minn.1998); *Collora v. Leahy (In re Leahy),* 170 B.R. 10, 15 (Bankr. D.Me.1994); *see also Barclays Am./Bus. Credit, Inc. v. Long (In re Long),* 774 F.2d 875, 880–81 (8th Cir.1985) ("Congress tells us in § 523(a)(6) that malice and willfulness are two different characteristics. They should not be lumped together to create an amorphous standard to prevent any conduct that may be judicially considered to be de-

plorable."). Thus, to prevail on summary judgment, McAlister must demonstrate that the prior proceeding(s) determined Slosberg's liability to him for injuries both "willful" and "malicious" within the meaning of the Bankruptcy Code. *See Printy v. Dean Witter Reynolds, Inc.,* 110 F.3d 853, 858 (1st Cir.1997); *Reynolds–Marshall,* 162 B.R. at 55.

Section 523(a)(6)'s landscape was recently re-contoured by the Supreme Court in *Kawaauhau v. Geiger (In re Geiger),* —— U.S. ——, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). *In re Geiger* defines "willful" in a manner significantly at odds with much existing precedent, including that in the First Circuit. Lamentably, *In re Geiger* is at the same time silent regarding the meaning of "malicious," although its redefinition of "willful" incorporates much (at first blush some might say all) of what "malicious" once meant in § 523(a)(6)'s context.

To determine whether the state court judgment resolved the same issues as McAlister's § 523(a)(6) claim presents, I will examine the section's post-*In re Geiger* content and then compare it to the state law issues determined by McAlister's state law judgment.

*a. Willfulness and Malice Before In re Geiger*

In a recent pre-*In re Geiger* decision, the First Circuit adopted a definition of willful and malicious injury from what it termed "the rule of the Massachusetts bankruptcy courts and the further refinement of it in Collier's treatise on bankruptcy." *Printy,* 110 F.3d at 859. The court summarized the Massachusetts rule:

" 'Malicious' means an act done in conscious disregard of one's duties. No special malice toward the creditor need be shown.

. . .

[T]he term 'willful and malicious' in § 523(a)(6) means an act intentionally committed, without just cause or excuse, in conscious disregard of one's duty and that necessarily produces an injury."

*Id.* (alteration in original) (quoting *In re Lubanski*, 186 B.R. 160, 165 (Bankr.D.Mass. 1995)). The panel went on to quote extensively from *Collier on Bankruptcy:*

> To fall within the exception of section 523(a)(6), the injury to an entity or property must have been willful and malicious. An injury to an entity or property may be a malicious injury within this provision if it was wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-will.
>
> The word "willfull" [sic] means "deliberate or intentional," referring to a deliberate and intentional act that necessarily leads to injury. Therefore, a wrongful act done intentionally, which necessarily produces harm or which has a substantial certainty of causing harm and is without just cause or excuse, may be a willful and malicious injury. While something more than a mere voluntary act is necessary to satisfy the scienter requirement of section 523(a)(6), specific intent to injure is not necessary.
>
> The malice element of section 523(a)(6) requires an intent to cause the harm, and the fact that the injury was caused through negligence or recklessness does not satisfy that standard of proof. An injury inflicted willfully and with malice under section 523(a)(6) is one inflicted intentionally and deliberately, and either with the intent to cause the harm complained of, or in circumstances in which the harm was certain or almost certain to result from the debtor's act.

*Id.* (alteration in original) (quoting 4 *Collier on Bankruptcy* ¶ 523.12 (15th ed.1996)).[7]

Before *In re Geiger*, First Circuit law held that § 523(a)(6)'s willful element required a showing that the act causing the injury was an intentional act. *See Printy*, 110 F.3d at 859; *Reynolds–Marshall*, 162 B.R. at 55; *In re Leahy*, 170 B.R. at 15 (intent to do the act). But subjective intent to cause the injury was *not* required. *See Reynolds–Marshall*, 162 B.R. at 55 ("The intent required is the 'intent to do the act at issue, not intent to injure the victim,'" quoting *In re Britton*, 950 F.2d 602, 605 (9th Cir.1991)).

The malice element, however, did include intent to cause the injury, albeit not "'specific intent to injure.'" *See Printy*, 110 F.3d at 859 (quoting 4 *Collier on Bankruptcy* ¶ 523.12 (15th ed.1996)). The creditor was not required to demonstrate that the debtor acted "out of spite or ill will towards the creditor." *Reynolds–Marshall*, 162 B.R. at 56. *See also Printy*, 110 F.3d at 859; *Corbett v. Picard (In re Picard)*, 133 B.R. 1, 3 (Bankr.D.Me.1991). Rather, proving malice required a showing that the act was undertaken "'either with the intent to cause the harm complained of, or in circumstances in which the harm was certain or almost certain to result,'" *Printy*, 110 F.3d at 859, that it was "'wrongful' and undertaken 'without just cause.'" *Reynolds–Marshall*, 162 B.R. at 56; *accord In re Leahy*, 170 B.R. at 15; *In re Picard*, 133 B.R. at 3.

### b. *In re Geiger* and "Willful"

█ *In re Geiger* establishes that to satisfy the "willful" element of § 523(a)(6) a creditor must show that there was "a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *In re Geiger*, —— U.S. at ——, 118 S.Ct. at 977. "[D]ebts arising from recklessly or negligently inflicted injuries," the Court held, "do not fall within the compass of § 523(a)(6)." *Id.* at 978.[8] The Court considered it significant that "the (a)(6) formulation triggers in the

---

7. The *Printy* court went on to conclude that, "whatever standard [was] applied," knowingly taking advantage of a securities firm's electronic crediting error that inflated the borrowing limit of the debtor's trust account "translates easily into an intent to willfully and maliciously cause harm." *Id.* at 859–60.

8. *In re Geiger*'s holding seemed primarily aimed at overruling interpretations of § 523(a)(6) that drew debts for "recklessly or negligently inflicted injuries" within the discharge exception. *Id.* at 978. The *In re Geiger* Court took pains to narrow the holding of *Tinker v. Colwell*, 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904), the grandfather of cases interpreting the "willful and malicious injury" exception to bankruptcy discharge. *See* 118 S.Ct. at 976–78. Notwithstanding the *In re Geiger* Court's concerns, however, the drafters of the 1978 Code clearly expressed the intention to so limit *Tinker, see* S.Rep. No. 95–989, p. 79 (1978); H.R.Rep. No. 95–595, p. 365 (1977), and the lower courts have repeatedly noted that legislative decision, *see Johnson v. Miera (In re Miera)*, 926 F.2d 741, 744 (8th

lawyer's mind the category 'intentional torts,' as distinguished from negligent or reckless torts." *See id.* at 977.[9]

### c. Willfulness and Malice After In re Geiger

### i. Willful

*In re Geiger* has worked significant changes in the law. It overrules decisions holding that the discharge exception's willfulness element could be satisfied without proving that the debtor acted with the intent to cause the injury.[10] The requirement that the debtor act with the intent to cause injury necessitates different proof, more demanding proof than many courts previously required, of creditors seeking to establish this element of § 523(a)(6) nondischargeability.[11]

Although the Supreme Court did not state that § 523(a)(6)'s willfulness element includes acts intentionally done and which are known by the actor to be "*substantially* certain to cause injury," I conclude, in accord with most post-*In re Geiger* § 523(a)(6) decisions,[12] that obligations arising from such conduct remain within the discharge exception.

Cir.1991); *Miller v. Held (In re Held)*, 734 F.2d 628, 629–30 (11th Cir.1984); *Kelt v. Quezada (In re Quezada)*, 718 F.2d 121, 122–23 (5th Cir. 1983); *Hayduk v. Page (In re Page)*, 197 B.R. 61, 64 (Bankr.N.D.Ohio 1996); *Night Kitchen Music v. Pineau (In re Pineau)*, 141 B.R. 522, 526 & n. 19 (Bankr.D.Me.1992), *reversed on other grounds Knight Kitchen Music v. Pineau (In re Pineau)*, 149 B.R. 239 (D.Me.1993); *Denehy v. Zalowski (In re Zalowski)*, 107 B.R. 431, 433 (Bankr. D.Mass.1989), interpreting the statute with that point in mind. *Compare, e.g., Reynolds–Marshall*, 162 B.R. at 55–56 (debtor's conversion, involving as it did the execution and destruction of deeds in contravention of parties' agreement and the conveyance of real property to a third party for inadequate consideration, was sufficiently deliberate and intentional to qualify as willful), *with In re Leahy*, 170 B.R. at 13–16 (debtor/employer's failure to secure unemployment insurance not in the ambit of § 523(a)(6) willfulness as creditor/employee did not demonstrate deliberate and intentional conduct). *See generally* Charles Jordan Tabb, *The Scope of the Fresh Start in Bankruptcy: Collateral Conversions and the Dischargeability Debate*, 59 Geo. Wash.L.Rev. 56, 73–78 (1990).

**9.** The Court continued, "[i]ntentional torts generally require that the actor intend 'the consequences of an act,' not simply 'the act itself.' " *Id.* (quoting *Restatement (Second) of Torts* § 8A, comment a, p. 15 (1964)).

**10.** *See e.g., Printy*, 110 F.3d at 859 (First Circuit); *Papadakis v. Zelis (In re Zelis)*, 66 F.3d 205, 208 (9th Cir.1995); *Britton v. Price (In re Britton)*, 950 F.2d 602, 605 (9th Cir.1991); *Vulcan Coals, Inc. v. Howard*, 946 F.2d 1226, 1228–29 (6th Cir.1991); *C.I.T. Fin. Servs., Inc. v. Posta (In re Posta)*, 866 F.2d 364, 367 (10th Cir.1989); *Perkins v. Scharffe*, 817 F.2d 392, 393 (6th Cir. 1987); *Impulsora Del Territorio Sur, S.A. v. Cecchini (In re Cecchini)*, 780 F.2d 1440, 1442–43 (9th Cir.1986); *First Nat'l Bank of Albuquerque v. Franklin (In re Franklin)*, 726 F.2d 606, 610 (10th Cir.1984); *Reynolds–Marshall*, 162 B.R. at 55; *Night Kitchen Music v. Pineau (In re Pineau)*, 149 B.R. 239, 242 (D.Me.1993); *In re Pineau*, 141 B.R. at 526. *See also* 4 *Collier on Bankrupt-*

*cy, supra,* ¶ 523.12 (willful act need not involve intent to injure) (15th Ed.1996).

**11.** Since the *In re Geiger* decision, a number of reported decisions have been rendered declaring that the plaintiff had failed to prove the necessary intent to harm required to satisfy § 523(a)(6)'s willfulness element. *See Salem Bend Condominium Ass'n v. Bullock–Williams (In re Bullock–Williams)*, 220 B.R. 345 (6th Cir. BAP 1998) (condominium owner's failure to pay fees to the association did not demonstrate the necessary intent to cause harm to the association when record indicated that the debtor thought the fees were being paid by either the Chapter 13 trustee or her children); *Florida Outdoor Equip., Inc. v. Tomlinson (In re Tomlinson)*, 220 B.R. 134 (Bankr.M.D.Fla.1998) (debtor's failure to turn over inventory sale proceeds to secured creditor did not qualify as willful under *In re Geiger* as it was not done with intent to injure creditor but to assist own business); *Avco Fin. Servs. of Billings v. Kidd (In re Kidd)*, 219 B.R. 278, 286 (Bankr.D.Mont.1998) (circumstances surrounding debtor's conversion of collateral did not involve debtor's belief that creditor would be "substantially certain to suffer harm as a result of his actions," noting the debtor's mental problems and use of depression medication at the time the collateral was transferred to a third party); *In re Dziuk*, 218 B.R. 485 (while debtor acted intentionally in setting fire to an ice house he did not intend that the fire would spread, causing injury to another's premises, and thus the injury to creditor was not willful under *In re Geiger* ).

**12.** *See State of Texas v. Walker*, 142 F.3d 813, 823–24 (5th Cir.1998) (retention of a professional fee by university professor/debtor against university policy might be an intentional injury under *In re Geiger* if the debtor kept the fees knowing that it would deprive the university of money to which it had rights); *In re Kidd*, 219 B.R. at 285 (the "subjective test" of the *In re Geiger* willfulness inquiry—that is "whether the injury was in fact anticipated by the debtor"—includes the alternatives that the act was done with the specific

The "substantially certain" alternative is a prominent aspect of the *Restatement* section the Court embraces. *See Restatement (Second) of Torts, supra,* § 8A. It is an ingredient of the text of § 8A and comment b., as well as the first illustration. Although the Court did not cite comment b., it could be of some significance to future applications of § 523(a)(6). It reads:

> All consequences which the actor desires to bring about are intended, as the word is used in this Restatement. Intent is not, however, limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result. As the probability that the consequences will follow decreases, and becomes less than substantial certainty, the actor's conduct loses the character of intent, and becomes mere recklessness.... As the probability decreases further, and amounts only to a risk that the result will follow, it becomes ordinary negligence.... All three have their important place in the law of torts, but the liability attached to them will differ.

*Id.* cmt. b. The first illustration offers practical guidance as to how this standard might factually appear:

> intent to injure the creditor or the act was done "knowing, with substantial certainty, that the creditor would be harmed"); *accord In re Dziuk*, 218 B.R. at 487. *But see Berger v. Buck (In re Buck)*, 220 B.R. 999, 1004 (10th Cir. BAP 1998) (suggesting that the new willful standard requires evidence that debtor had a "motive to harm" the creditor); *In re Tomlinson*, 220 B.R. at 137–38 (stating that the Eleventh Circuit "substantially certain" standard in inconsistent with *In re Geiger* and applying a strict "intent to cause injury" standard).

**13.** The First Circuit has decided one § 523(a)(6) case since *In re Geiger*. In *Roumeliotis v. Popa (In re Popa)*, 140 F.3d 317 (1st Cir.1998) the court summarily concluded that an employer/debtor's failure to obtain workers' compensation insurance (which left the creditor without such coverage when he was injured on the job), although intentional, was not "willful" because he did not act with an intention to cause injury. *See id.* at 318.

**14.** One cannot say that *In re Geiger* will change the result in cases such as *In re Popa*, 140 F.3d

A throws a bomb into B's office for the purpose of killing B. A knows that C, B's stenographer, is in the office. A has no desire to injure C, but knows that his act is substantially certain to do so. C is injured by the explosion. A is subject to liability to C for an intentional tort.

*Id.* illus. 1.

The actor's *subjective* knowledge that the injury is certain or substantially certain to occur distinguishes this articulation of willful from articulations of implied malice that turn on whether the actor should objectively appreciate the danger his conduct creates. Thus, a debtor who intentionally acts in a manner he knows, or is substantially certain, will harm another may be considered to have intended the harm and, therefore, to have acted willfully within the meaning of § 523(a)(6).[13]

#### ii. Malice

Having discerned what "willful" means after *In re Geiger*, I must consider the post-*In re Geiger* content of § 523(a)(6) "malice." Before *In re Geiger* most § 523(a)(6) litigants battled over the question of whether the debtor had acted with malice when the creditor suffered loss. *See* Tabb, *supra,* at 78–89.[14] Though the terms might share ele-

317, where the obligation at issue stems from a debtor's failure to maintain insurance coverage, even statutorily required coverage. *See e.g., In re Leahy*, 170 B.R. 10 (employer/debtor's obligation to employee/creditor for failure to carry worker's compensation insurance dischargeable because record did not demonstrate that employer knew he was uninsured or that his actions were certain or almost certain to cause employee harm); *In re Zalowski*, 107 B.R. at 433–34 (conduct of employer/debtor did not necessarily lead to employee/creditor's injury within the meaning of the pre-*In re Geiger Collier* articulation of willful and malicious because the occurrence of a compensable injury during the insurance lapse was not a given).

However, *In re Geiger* certainly will change the analysis. The First Circuit Bankruptcy Appellate Panel, whose *In re Popa* decision pre-dated *In re Geiger*, premised its conclusion that the debtor's obligation was dischargeable on the lower court's finding that the debtor did not intend to harm the creditor. However, it did so because such a finding compelled the conclusion that the injury was not inflicted with "malice" under the standard articulated in *Printy*. *See Roumeliotis*

ments, *i.e.*, they both require that the act itself be intentional, they must have independent significance. *See In re Long*, 774 F.2d at 880–81; *Reynolds–Marshall*, 162 B.R. at 55–56; *In re Dziuk*, 218 B.R. at 487; *In re Leahy*, 170 B.R. at 15. *In re Geiger* should not be read to collapse the two elements into one. *See e.g., United States v. Handy*, 761 F.2d 1279, 1280 (9th Cir.1985) ("A statute should be construed so as to avoid making any word superfluous."); *Zimmerman v. North American Signal Co.*, 704 F.2d 347, 353 (7th Cir.1983) ("As a general rule, a court should not construe a statute in a way that makes words or phrases meaningless, redundant, or superfluous."); *Tapp v. Fairbanks North Star Borough (In re Tapp)*, 16 B.R. 315, 320 (Bankr.D.Alaska 1981) ("It is a well known maxim of statutory construction that all words and provisions of a statute are intended to have meaning and are to be given effect, and that words of a statute are not to be construed as surplusage."); *see also In re Geiger*, —— U.S. at ——, 118 S.Ct. at 977 (stating hesitation to adopt an interpretation of § 523(a)(6) that would obviate the need for another element of the section).[15]

Establishing malice can no longer rest upon demonstrating intent to cause injury as it did in this Circuit prior to *In re Geiger*. Malice must add *something* to the § 523(a)(6) equation. But what?

The question is not answered by the two Eighth Circuit opinions from which the Supreme Court appeal was taken. Initially, the circuit's panel determined that the debtor's actions were undertaken without an intention to injure the creditor and, therefore, lacked malice. *Geiger v. Kawaauhau (In re Geiger)*, 93 F.3d 443, 445 (8th Cir.1996). The panel spent no time illuminating the concept of § 523(a)(6) willfulness. However, the *en banc* court, of the same view that there was "no evidence that the [debtor/doctor] intended to harm his patient," concluded that it was "not possible to say that his actions were either willful or malicious, *much less both.*" *Geiger v. Kawaauhau (In re Geiger)*, 113 F.3d 848, 849 (8th Cir.1997) (emphasis added). The *en banc* court suggested that proof of an intentional tort suffices to establish both willfulness and maliciousness within the context of § 523(a)(6). *See id.* at 853–24.

Earlier cases from the Eighth and other circuits, declaring that a wrongful act was malicious if it were "targeted at the creditor," suffer the same fate as other pre-*In re Geiger* malice formulations: The content they ascribe to the statute's malice element is now subsumed in the *In re Geiger* definition of willfulness. *See Reynolds–Marshall*, 162 B.R. at 55 ("Establishing malice requires an additional showing such as demonstrating that the acts complained of were targeted at the creditor such that the acts were certain or almost certain to inflict financial or other harm."); *In re Pineau*, 149 B.R. at 243 (proposing for the First Circuit the *In re Long* "intermediate position finding the requisite malice when a debtor intends *or* fully expects to harm the economic interest of the creditor."); *see also In re Long*, 774 F.2d at 881.[16]

---

v. Popa (In re Popa), 214 B.R. 416, 421–22 (1st Cir. BAP 1997); *compare In re Popa*, 140 F.3d 317 (unintended injury not "willful" under *In re Geiger*).

**15.** Collapsing the two previously distinct elements is an understandable temptation given the difficulty generated by *In re Geiger*'s remodeling of "willful." Witness the latest revisions to *Collier*. *See* 4 Collier on Bankruptcy ¶ 523.12 (15th ed. rev.1998). Discussing the *In re Geiger* redefinition of willful, the treatise forgoes any independent discussion of the meaning of malice, editing out its previous discussion of that term, *see id.*, relied upon in *Printy* and in other circuits.

**16.** The "targeted at the creditor" standard, announced in *In re Long*, was itself drawn from *Restatement* § 8A. *See id.*

I do not see how, if the malice element is to have independent significance, continuing to employ a "targeted at the creditor" definition has utility. *IIn re Dziuk*, which takes the other view, is a case in point. The *In re Dziuk* debtor set fire to his icehouse to prove to his girlfriend that he loved her more than he loved it. At the time, the icehouse was sitting in his friend's driveway, within a spark's flight to the friend's home. In an action brought by the friend's insurer, the court concluded that the debtor's acts were not willful (in the *In re Geiger* sense) because he intended to torch the icehouse and did not intend to ignite his friend's residence. *See* 218 B.R. at 488. It concluded that the act was not malicious because it was "targeted" at his own property, not the friend's. *See id.* I find it hard to see how the element of malice retains independent significance from willful when so defined.

■ I do not agree with Slosberg's contention that, after *In re Geiger*, a showing of spite, ill will, or vengeance is now the exclusive avenue to satisfying the statute's malice element.[17] Cases predating *In re Geiger*, but which applied the "intentional tort" standard to § 523(a)(6)'s willfulness element, did not adopt such a view of malice. *Compare, e.g., Conte v. Gautam (In re Conte)*, 33 F.3d 303, 308 (3d Cir.1994) (malice does not require "intent to injure"), *and St. Paul Fire & Marine Ins. Co. v. Vaughn*, 779 F.2d 1003, 1009 (4th Cir.1985) ("To require specific malice or some other strict standard of malice for non-dischargeability of a debt under the Bankruptcy Code would undermine the purposes of that provision and place 'a nearly impossible burden' on a creditor who wishes to show that a debtor intended to do him harm," quoting *United Bank of Southgate v. Nelson*, 35 B.R. 766, 772 (N.D.Ill.1983)), *with Novartis v. Luppino (In re Luppino)*, 221 B.R. 693, 699–700 (Bankr.S.D.N.Y.1998) ("The Supreme Court [in *In re Geiger*] appears to have instructed that actual or Biblical malice is required."). *See also* 4 *Collier on Bankruptcy, supra,* ¶ 523.12 (15th Ed. Rev.1998) (interpreting *In re Geiger* and suggesting that a specific intent to injure is not required under its holding).[18]

■ Section 523(a)(6) malice can have meaning, meaning that adds something to the statute's willfulness requirement: A showing of malice requires a showing that the debtor's willful, injurious conduct was undertaken without just cause or excuse. This conclusion finds support in the pre-*In re Geiger* case law. In a part of *Tinker* that the *In re Geiger* Court left undisturbed, legal malice is defined as "a wrongful act, done intentionally, without just cause or excuse." *Tinker*, 193 U.S. at 486, 24 S.Ct. 505. *See also In re Conte*, 33 F.3d at 308; *St. Paul Fire & Marine Ins. Co.*, 779 F.2d at 1009; *Federal Deposit Ins. Corp. v. Cerar (In re Cerar)*, 97 B.R. 447, 452 (C.D.Ill.1989); *In re Leahy*, 170 B.R. at 15; *In re Pineau*, 141 B.R. at 527–29; *In re Zalowski*, 107 B.R. at 433.

So defined, the statute's malice requirement will withdraw from the discharge exception obligations arising from acts done knowing that injury is a substantially certain consequence, but done for reasons that justify or excuse the act. *See e.g., In re Cerar*, 97 B.R. at 452–53 (discussing whether there was sufficient duress to establish cause or excuse in debtor's forgery of notes to avoid a bank foreclosure) *See also Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 332–33, 55 S.Ct. 151, 79 L.Ed. 393 (1934) (concluding that the obli-

17. Indeed, it is not clear that so-called "express malice" is relevant to the post—*In re Geiger* § 523(a)(6) malice inquiry.

18. The law follows a tricky path in this territory. A century ago, soon to be appointed Supreme Court Justice, Oliver Wendell Holmes, Jr., explained the boundaries between legal and moral malice. In a passage from *The Path of Law*, he reflected:

It is enough to take malice as it is used in the law of civil liability for wrongs—what we lawyers call the law of torts—to show you that it means something different in law from what it means in morals, and also to show how the difference has been obscured by giving to principles which have little or nothing to do with each other the same name. Three hundred years ago a parson preached a sermon and told a story out of Fox's *Book of Martyrs* of a man who had assisted at the torture of one of the saints, and afterward died, suffering compensatory inward torment. It happened that Fox was wrong. The man was alive and chanced to hear the sermon, and thereupon he sued the parson. Chief Justice Wray instruct-

ed the jury that the defendant was not liable, because the story was told innocently, without malice. He took malice in the moral sense, as importing a malevolent motive. But nowadays no one doubts that a man may be liable, without any malevolent motive at all, for false statements manifestly calculated to inflict temporal damage. In stating the case in pleading, we still should call the defendant's conduct malicious; but, in my opinion at least, the word means nothing about motives, or even about the defendant's attitude toward the future, but only signifies that the tendency of his conduct under the known circumstances was very plainly to cause the plaintiff temporal harm.

Oliver Wendell Holmes, Jr., *The Path of Law, in The Essential Holmes* 160, 164–65 (Richard A. Posner ed., 1992) *See also Tinker*, 193 U.S. at 485–86, 24 S.Ct. 505 (distinguishing the "common acceptation" of malice as "ill will" from the "legal sense" of "done intentionally, without just cause or excuse"). If anything, *In re Geiger* adds a twist and a turn. The relation of conduct to inevitable (or substantially certain) injury under § 523(a)(6) is no longer a question of malice, it is one of willfulness. *See* discussion *supra*.

gation arising from the debtor's conversion of collateral was dischargeable absent "aggravated features"); *In re Long*, 774 F.2d at 881–82 (applying malice as defined in *Davis* ).[19] Such a definition of malice leaves intact part of the First Circuit's *Printy* holding.[20]

*In re Geiger's* definition of willful, however, does play havoc with the long-accepted concept of "implied malice" under § 523(a)(6). That is so because, historically, implied malice has been a concept encompassing much of what is now pertinent only to the issue of willfulness.[21]

### 2. State Court Litigation and the § 523(a)(6) Issues.

#### a. The Complaint

The state court's default order translated McAlister's complaint's allegations into findings of fact. *See McAlister v. Slosberg*, 658 A.2d 658 (Me.1995). The complaint alleged that Slosberg "negligently and carelessly handled the appeal"; that Slosberg "intentionally misrepresented the status of the appeal to [McAlister] in breach of his fiduciary duties"; that Slosberg's "breach of his professional obligations" were the "proximate result" of injury to McAlister including past and future "emotional distress, humiliation, the lost opportunity which may have resulted in prevailing on the appeals, counsel fees and court costs"; that Slosberg owed McAlister a fiduciary duty, including a "duty to deal honestly and openly" with McAlister; that Slosberg's "intentional breach of his fiduciary duty" was the proximate cause of McAlister's "humiliation and emotional distress"; and that Slosberg's "breach of his fiduciary duty was malicious, gross and wanton."

Thus, the default established that Slosberg owed McAlister a duty, that he breached his duty, and that damages resulted. With allegations phrased in the alternative, it did not finally establish that Slosberg acted willfully within the meaning of § 523(a)(6). Similarly,

**19.** *In re Geiger* and its implication for § 523(a)(6) malice brings this court full circle, back to its determination in *In re Pineau*. In that case, the judgment of dischargeability of a debt arising from a violation of copyright law arose from my determination under the malice prong of § 523(a)(6) that, while the act was wrongful, it was justified and excused by the course of dealings between the debtor and the copyright holder. *See* 141 B.R. at 530–31. The District court reversed. *See In re Pineau*, 149 B.R. 239. The reversal turned on the District court's determination that the violation was knowing, displaying a "voluntary willingness to disregard [the creditor's] rights" and, as such, constituted implied malice. *Id.* at 244–45. The District court did not settle on a malice standard, but toyed at length with *In re Long's* "intends *or* fully expects to harm the economic interests of the creditor." *Id.* at 243. It concluded that under either the standard used by this court or *In re Long*, implied malice was proven. *See id.* at 245. With *In re Long* no longer a tenable malice standard, and implied malice no longer operative under § 523(a)(6), *see* discussion *infra* note 20, the district court opinion is instructive now only for the factual disagreement as to whether sufficient justification or excuse was shown.

**20.** Quoting *Collier*, the *Printy* court defined malice as "wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill will." *Printy*, 110 F.3d at 859; 4 *Collier on Bankruptcy, supra*, ¶ 523.12 (15th ed.1996). *See also Shteysel v. Shteysel (In re Shteysel)*, 221 B.R. 486, 489 (Bankr.E.D.Wis.

1998) (articulating new *In re Geiger* willful standard and defining malice as " 'in conscious disregard of one's duties or without just cause or excuse,' " quoting *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir.1994)); *In re Nolan*, 220 B.R. at 730 (same, but quoting *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir.1986)).

**21.** Until *In re Geiger* this court considered that "implied malice" under § 523(a)(6) could "operate[ ] straightforwardly and fairly without incorporating a subjective 'targeting the creditor' requirement" if the record demonstrated that the " 'debtor acted deliberately and intentionally, in knowing disregard of the creditor's rights, without cause or excuse.' " *In re Leahy*, 170 B.R. at 15 n. 8 (*quoting In re Pineau*, 141 B.R. at 530). Implied malice's objective standard for state of mind, *i.e.*, conduct so outrageous that the actor ought to have known that his or her action would result in injury, is swallowed by *In re Geiger's* willful requirement. *See* discussion *supra*. If the injury must be intended under the willful prong of § 523(a)(6), a showing of implied malice, though perhaps theoretically satisfying the malice prong of § 523(a)(6), could not practically assist the creditor. *But see In re Nolan*, 220 B.R. at 730 (concluding that implied malice, defined as " 'when anyone of reasonable intelligence knows that the act in question is contrary to commonly accepted duties in the ordinary relationships among people, and injurious to another,' " survives under *In re Geiger*, quoting *Navistar Fin. Corp. v. Stelluti (In re Stelluti)*, 167 B.R. 29, 33 (Bankr.S.D.N.Y.1994)).

the complaint is insufficiently specific to establish malice for purposes of § 523(a)(6). The operative effect of the state court default and its resultant findings could not foreclose litigation of all § 523(a)(6) elements.

### b. The Jury Determination: Compensatory Damages

The trial judge instructed the jury that to find for McAlister on the professional negligence claim it must conclude that Slosberg's negligence was the proximate cause of McAlister's claimed injuries—lost wages and emotional distress—by a "fair preponderance of the evidence." The judge further instructed that Slosberg had conceded his negligence. Even if given preclusive force, the jury's verdict awarding McAlister compensatory damages was, at most, a determination that Slosberg's negligence proximately caused compensable injury.

### c. The Jury Determination: Punitive Damages

To award McAlister punitive damages, the jury had to conclude that Slosberg acted with malice, as that term is defined under Maine law. See McAlister, 658 A.2d at 660; Tuttle v. Raymond, 494 A.2d 1353, 1361 (Me.1985).

The trial judge instructed the jury it could award punitive damages only if it found "that Mr. McAlister has proven by clear and convincing evidence that Mr. Slosberg acted with malice." The court defined malice as conduct arising out of "ill-will" towards McAlister or "deliberate conduct which, while motivated by something other than ill-will toward any particular person, is nevertheless so outrageous that malice toward a person injured as a result of the conduct can be implied." "To meet the standard of implied malice," it elaborated, "the conduct at issue must be such that it would almost certainly result in injury to the plaintiff, in this case Mr. McAlister, or to other persons." [22] The court included in its charge the instruction that the jury could "consider only the aggravating and mitigating facts presented by the evidence including the nature and quality of the outrageousness of the defendant's conduct."

■ The trial court articulated the standard for punitive damages set forth by the Maine's highest court in Tuttle, 494 A.2d 1353.[23] Tuttle recast the standard for punitive damages in Maine, eliminating the potential that they could be awarded for reckless conduct, instead requiring proof of malice as a prerequisite. See id. at 1361.[24] Under Tuttle, "malice will be most obviously satisfied by a showing of 'express' or 'actual' malice. Such malice exists where the defendant's tortious conduct is motivated by ill will toward the plaintiff." Id. However, the court also allowed for implied malice, "where deliberate conduct by the defendant, although motivated by something other than ill will toward any particular party, is so outrageous that malice toward a person injured as a result of that conduct can be implied." Id. The Tuttle court further

22. The court further instructed the jury that even if they found malice, the question still remained as to whether punitive damages should be awarded. Taking the judge's malice instructions as a whole, Slosberg's contention that the judge never put the issue of malice before the jury is simply not sustainable. Slosberg's contention is all the more disingenuous in light of the footnote appended to the trial court's order denying Slosberg's post-trial motions: "It should be noted that liability for punitive damages was not established by default. At the trial on damages the jury was instructed, over plaintiff's objection, that he must prove 'malice' by the burden of clear and convincing evidence before such an award could be made."

23. Before In re Geiger, a plaintiff who established a right to punitive damages under the Tuttle formulation of malice could invoke collateral estoppel to satisfy the malicious element of § 523(a)(6). See Reynolds–Marshall, 162 B.R. at 56 (analyzing the Tuttle standard and concluding that a finding thereto clearly satisfied § 523(a)(6)'s malice requirement).

24. After hinting at its willingness to reconsider punitive damages in an earlier case, see Hanover Ins. Co. v. Hayward, 464 A.2d 156, 158 n. 2 (Me.1983), the Tuttle court reigned back their availability. In Tuttle the Law Court eliminated punitive damages in cases where the defendant's conduct amounts to no more than "mere reckless disregard of the circumstances." Tuttle, 494 A.2d at 1361–62 ("[B]y allowing punitive damages based only upon this more certain and more culpable class of conduct, the efficiency and the fairness of the doctrine as a deterrent is increased.").

raised the bar for the plaintiff seeking punitive damages by requiring that the plaintiff "prove by clear and convincing evidence that the defendant acted with malice." *Id.* at 1363.[25]

■ The *Tuttle* charge simply did not require the jury to find that Slosberg acted with the intent to cause McAlister injury. It is true that the jury had to conclude that Slosberg's actions were intentional. But the jury did not have to conclude that Slosberg, *subjectively,* was certain or substantially certain that injury to McAlister would result. It could have concluded only that the conduct was so outrageous that, from an *objective* standpoint, injury was highly likely to result. What is more, there was no finding that Slosberg acted without just cause or excuse.

Thus, the state court judgment determined neither willfulness nor maliciousness within the meaning of § 523(a)(6).

Because the issues are not identical, preclusion is not appropriate. *See e.g., Gillman,* 711 A.2d at 156 ("A prior judgment can be used for collateral estoppel only if the identical issue necessarily was determined by a prior final judgment.") Thus, McAlister is not entitled to summary judgment on his § 523(a)(6) claim.

### C. Preclusion and McAlister's § 523(a)(4) Claim

■ I can dispense of McAlister's underdeveloped § 523(a)(4) argument with greater dispatch. As relevant to his preclusion claim, McAlister contends that Slosberg's failure to honor the jury determination that Slosberg must repay the $3800 he paid toward Slosberg's work on the paternity appeal and his noncompliance with the Board of Bar of Overseers' fee arbitration award "constitutes fraud or defalcation while [Slosberg] was acting in a fiduciary capacity for [McAlister]." First, noncompliance with a prior final judgment is neither grounds for preclusion nor *prima facie* evidence of fraud and defalcation. I also note that the jury was not instructed on any theories founded on the parties' fiduciary relationship. Even had they been, their verdict could have been based on other theories McAlister had pleaded. Issues pertinent to McAlister's § 523(a)(4) claim were not "necessarily determined" on the way to judgment. Moreover, any argument based on orders promulgated by the Board of Bar Overseers cannot carry the day; the summary judgment rec-

---

**25.** While *Tuttle* was a marked constriction of the availability of punitive damages, its standard, though articulated in consistent terms, has slipped with time. Conduct arguably no more than reckless and not tangibly outrageous has qualified as malicious. The trial court's order denying Slosberg's post-trial motion demonstrates my point. The court concluded that the awards for legal fees and costs (uncontested by Slosberg), lost wages, and mental distress were supported by the evidence. While describing the award of punitives damages as "a closer question," the court stated that the evidence went beyond negligence:

> After [Slosberg] became aware that the appeal had been dismissed, on at least several occasions over a period of months, he affirmatively deceived [McAlister] concerning the status of the case. This action involved conduct both intentional and deceitful. It was a proper factual predicate upon which a jury could find "malice".

Other published decisions apply the state law malice standard more flexibly than *Tuttle* would seem to require. *See e.g., Lehouillier v. East Coast Steel, Inc.,* 13 F.Supp.2d 109, 110 (D.Me. 1998) (denying defendant's motion for summary judgment because a jury could conclude that defendant's conduct in creating an inescapable "temporary zone of danger" by transporting an unlighted 120 foot "I" beam on a tractor trailer at night without a police escort as required by the state permit was "sufficiently outrageous" to amount to clear and convincing evidence of malice under *Tuttle* ); *DiPietro v. Boynton,* 628 A.2d 1019, 1024 (Me.1993) (affirming finding of malice based on defendant's conversion of plaintiff's property, stating that directing the sale of plaintiff's property without notifying them and with knowledge that it had not been abandoned supported a finding of "ill will," citing *Tuttle* ); *Pombriant v. Blue Cross/Blue Shield of Maine,* 562 A.2d 656, 659–60 (Me.1989) (affirming finding of malice predicated on insurance company's intentional interference with the contractual negotiations between former broker and client, citing *Tuttle* standard). *But see Kelleher v. Boise Cascade Corp.,* 683 F.Supp. 858, 859–60 (D.Me.1988) (allegations that defendant failed to properly warn plaintiff of potential danger of diving in paper mill effluent run-off tanks is not enough for malice under *Tuttle* ); *Boivin v.. Jones & Vining, Inc.,* 578 A.2d 187, 189 (Me.1990) (breaching of an oral promise of employment not enough under *Tuttle* ).

ord is insufficient.[26] No more need be said.

**CONCLUSION**

For the reasons set forth above, the plaintiff's motion for summary judgment is denied.